826 A.2d 821

NEW JERSEY DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF–RESPONDENT, v. S.V.,
DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP OF S.I.V.,
V.E.V., E.M.V., M.M.V., AND D.J.V., MINORS.

Superior Court of New Jersey
Appellate Division

Submitted May 14, 2003—Decided July 8, 2003.

Before Judges WEFING, WECKER and FUENTES.

*Yvonne Smith Segars,* Public Defender, attorney for appellant (*Michael C. Kazer,* Designated Counsel, on the brief).

*Peter C. Harvey,* Acting Attorney General, attorney for respondent *New Jersey Division of Youth and Family Services (Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Paula S. Alvarez,* Deputy Attorney General, on the brief).

*Yvonne Smith Segars,* Public Defender, Law Guardian, attorney for *S.I.V., V.E.V., E.M.V., M.M.V., and D.J.V.,* minor child-respondents (*Scott I. Fegley,* Designated Counsel, on the brief).

The opinion of the court was delivered by

WECKER, J.A.D.

Defendant, S.V., appeals an order terminating her parental rights to her five biological children. S.V. was born September 10, 1975 and married at age fifteen. She had four daughters: S.I.V., born July 18, 1991; V.E.V., born December 6, 1993; E.M.V., born April 20, 1995; and M.M.V., born December 11, 1997. Defendant's youngest child, a son, D.J.V., was born May 25, 1999. S.V.'s husband, defendant B.V., is the biological father of defendant's four daughters. He voluntarily surrendered his parental rights before the trial judge. The father of the youngest child, R.L., failed to appear at the trial. His parental rights were terminated as well.[1]

The New Jersey Division of Youth and Family Services (DYFS) initiated this matter by Order to Show Cause and Verified Complaint filed on August 7, 2001. A trial was held before Judge Salvatore Bovino on October 7, 8, and 11, 2002. All three defendants were represented by counsel, and the children were represented by a law guardian. The judge heard the testimony of Valerie Smith and Inez Perez, both DYFS caseworkers assigned to S.V., Deborah Pruse, who was employed by DYFS in its northern region Adoption Resource Center, and Dr. Richard S. Klein, a psychologist called by S.V. The judge also admitted into evidence psychological evaluations of S.V. prepared by several psychologists and bonding evaluations prepared by a psychologist, Dr. Robert Raymond. Several written psychological evaluations of S.V. were also in evidence. S.V. did not testify. At the

---

[1] Although R.L. did not appear himself, his attorney was present through the entire trial. The judge rejected R.L.'s attorney's request to deny termination of his parental rights with respect to D.J.V. and instead to place the child with R.L.'s mother. In light of R.L.'s total absence from the child's life since his birth; R.L.'s mother's failure to respond to DYFS's inquiry, regarding a possible placement; and R.L.'s failure to cooperate with his attorney or to appear at the trial, there is no basis for intervention in the judgment terminating his parental rights.

Neither B.V. nor R.L. has appealed the judgment terminating his parental rights.

conclusion of the trial, Judge Bovino rendered a detailed oral opinion, setting forth findings of fact and conclusions of law in support of his decision terminating the parental rights of S.V., as well as B.V. and R.L.

The family first came to the attention of DYFS in 1999, as a result of allegations of inadequate housing and domestic violence. Investigation revealed roach-infested quarters with no utility service. Over the next several years, DYFS attempted to assist S.V. in obtaining Section 8 housing, but she repeatedly failed to follow up on that assistance and allowed her vouchers to expire. DYFS assisted her in applying for welfare and housing assistance, to little avail. S.V. passed the children around to various relatives during several periods when she was homeless. The children variously reported incidents of domestic violence between S.V. and B.V., and the oldest three subsequently reported sexually inappropriate behavior toward them by S.V.'s boyfriend. Evidence also revealed that the older children had not been attending school.

In or about September 2000, DYFS removed the children from their temporary foster care placements and placed them with their current caregivers. There is evidence that S.V. attended some parenting skills classes to which she was referred by DYFS, and that she underwent some psychiatric counseling. However, the judge noted the absence of evidence "that she was successfully discharged ... [or] that her being taken off the medication was authorized by her doctor." In early 2002, S.V. reported that she was going to school and then that she had found employment. However, she did not cooperate with attempts to confirm her schedule in order to accommodate a visitation schedule to her needs. Neither has DYFS been able to confirm S.V.'s numerous claims over the years that she had found employment or was about to obtain a residence. The judge found, based on substantial credible evidence, that S.V. "has had no stable housing since this case began back in May of 1999." He noted that she "did not always appear in court as required and that she had missed [several] court dates ...."

Dr. Elias Fernandez was retained by DYFS to provide an evaluation of S.V., who was twenty-five at the time of Dr. Fernandez's assessment in November 2000. His report included S.V.'s admission that the children had witnessed domestic violence. He was unable to obtain valid results of two psychological tests he attempted. He diagnosed an adjustment disorder with depressive features and features of a dependent personality. In his opinion, S.V.'s prognosis would be "fair" if she stabilized herself and had a home for the children.

DYFS also submitted a psychiatric evaluation report prepared by Dr. Devendra Kurani in February 2001. Dr. Kurani found no evidence of psychiatric illness or substance abuse that would prevent her from caring for her children, but that her behavior indicated poor judgment and failure to understand the parental role.

A psychiatric evaluation by Dr. Alavaro Gutierrez dated September 2001 included S.V.'s acknowledgments that she was unable to care for the children, that they had been physically abused by her boyfriend, although she denied being aware that there had been sexual abuse, that she had been essentially homeless since 1999, and that the children had witnessed acts of domestic violence against her both by her husband and her boyfriend. Dr. Gutierrez found that S.V. minimized and denied responsibility for neglect and abuse of her children.

Another psychological evaluation of S.V. was completed by Dr. Robert Raymond and reported in January 2002. His report was consistent with the others obtained. However, he also reported that S.V. told him that up until three months before her visit with him, she had been feeling suicidal, but no longer had those feelings. She claimed to have experienced a religious conversion and to have come to terms with feelings of inadequacy with respect to her mother and sister.

Dr. Raymond also prepared bonding evaluations of the children, both with S.V. and with their caregivers. Like Dr. Klein, he found some attachment between S.V. and the children, and with the

exception of the oldest child, appropriate interaction between them. Bonding evaluations of the children with their respective caregivers evidenced strong attachments and significant improvement and stabilization of previously observed behavior problems.

The children's Law Guardian reported that each of the four girls expressed the wish to be adopted by her present caregiver, and that the youngest, who had been with his caregiver for the last two of his three years, was not old enough to express his wishes. The guardian strongly urged the court to find it in each child's best interests for S.V.'s parental rights to be terminated, freeing the children for adoption.

S.V. presented the expert testimony of Dr. Klein, who concluded that the children had a bond with S.V., and that she had the potential for establishing future stable housing and employment and therefore for reunification with the children. The judge concluded that Dr. Klein failed to take into consideration defendant's unstable history in predicting her future and failed to consider the children's bonds with their present caregivers when he concluded that termination would do more harm than good. We agree that there is virtually no substantiating evidence for Dr. Klein's optimistic predictions about S.V.'s future ability to parent these children. The judge found that the children require permanency, that adoption is in their best interest, and that they would be harmed by further delay while waiting for defendant to "put her act together."

The caregivers, four cousins of defendant, have taken in these five children, and DYFS presented evidence that although there was some initial reluctance, all of the caregivers are now interested in adoption.[2] Expert bonding evaluations of each of the children with their caregivers indicate significant bonding and positive relationships, all stronger than the children's relationships

---

[2] In September 2000, the five children were placed in the care of four of S.V.'s cousins. D.J.V. and V.E.V. are the only two children who will remain together; however, all four of the caregivers are themselves siblings.

with their mother. The oldest child has expressed negative feelings about living with her mother, and there is expert evidence that a return to her mother would be particularly harmful to S.I.V. Expert evaluations confirmed that S.I.V. had been subjected to some inappropriate sexual conduct. Similar reports by V.E.V. and E.M.V. were not confirmed.

The judge found that Dr. Klein, S.V.'s expert witness, minimized all of the past history and focused unduly upon an unsupported prediction of future ability to parent and provide a supportive environment for the children. The judge discounted defendant's reports of "periodic employment for short periods of time," noting that "her employment almost coincides with either evaluations or with court requirements." The judge also discounted much of Dr. Klein's testimony respecting likely harm to the children resulting from termination, an opinion not contained in Dr. Klein's written report. Specifically, the judge noted that:

> Dr. Klein gave no consideration to the ages of the children or their special needs or learning disability. [D.J.V.] was born May 25th, 1999, removed in June of 2000 at the age of one year, and has had visitation with his mother, but the caretaker that has provided parenting is his current caretaker. Dr. Klein makes no difference between [D.J.V.], who is three years and four months, and [S.I.V.] who is 11 and three months. Dr. Klein felt that age had no significance. Dr. Klein was not concerned about the bond that the children had with the caretaker. He felt that the bond was so strong with the mother that there would be trauma and the severance would be devastating.

> He ultimately came to another conclusion that any conclusion that I reach is traumatic for the children. He did indicate that there should be some suggestion— suggestion of therapy for the children. Testimony today is that the Division does offer post-termination adoptive therapy or counseling. What that would entail we won't know until we get there.

Finally, the judge noted "Dr. Klein's opinion ... that the children should wait indefinitely until such time as [defendant] could furnish the things that children need, a safe stable home, a nurturing environment." The judge concluded that Dr. Klein's suggestion "flies in the face of our law. It flies in the face of the children's need for permanency." Finding the first two elements of the best-interests test clearly established, the judge noted that

"[w]hether [S.V.] could parent another child at some other time remains to be seen."

The judge recognized that the children had bonds with both their mother and their caregivers, and that some harm would result from any decision he made. However, he concluded:

[S.V.] is unable to parent these five children. The five children were exposed to significant abuse and neglect. The children are in a safe and stable nurturing home. They require permanency and any harm caused to the children by severing the parental rights is clearly outweighed by the good that would be done to continue these children in a safe, stable, nurturing home.

"A parent's right to enjoy a relationship with his or her child is constitutionally protected." *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 346, 736 *A.*2d 1246 (1999). Moreover, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *New Jersey Div. of Youth and Family Servs. v. A.W.*, 103 *N.J.* 591, 600, 512 *A.*2d 438 (1986)(quoting *Santosky v. Kramer*, 455 *U.S.* 745, 787, 102 *S.Ct.* 1388, 1412, 71 *L.Ed.*2d 599, 628 (1982)). Accordingly, our courts have consistently imposed strict standards regarding the termination of parental rights. *K.H.O.*, 161 *N.J.* at 347, 736 *A.*2d 1246. However, "the right of parents to be free from governmental intrusion is not absolute." *A.W.*, 103 *N.J.* at 599, 512 *A.*2d 438. This is because the State, as *parens patriae*, has a responsibility to protect the welfare of children. *K.H.O.*, 161 *N.J.* at 347, 736 *A.*2d 1246. The grounds for termination of parental rights, originally set forth in *A.W.* and now codified at *N.J.S.A.* 30:4C–15.1(a), require a determination based upon the best interests of the child. The statute authorizes termination if DYFS proves by clear and convincing evidence:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.
[*N.J.S.A.* 30:4C–15.1(a).]

These four elements of the best interests test overlap and provide a comprehensive standard for deciding what is in a child's best interest. *K.H.O.*, 161 *N.J.* at 348, 736 *A.*2d 1246.

On appeal, the reviewing court must determine whether the trial court's decision to terminate parental rights was based upon clear and convincing evidence supported by the record. This review, however, is limited, and a trial court's factual findings "should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice." *In re Guardianship of J.N.H.*, 172 *N.J.* 440, 472, 799 *A.*2d 518 (2002) (quoting *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974)).

We now consider the evidence supporting the trial judge's findings respecting each of the four statutory elements. The evidence amply supports the judge's conclusions that S.V. has been unable to maintain stable housing; failed to take steps, aided by DYFS, to solve that problem; failed to see that the school-age children attended school; failed to protect the children from witnessing domestic violence by her husband, the father of her four daughters, and failed to protect them from physical and, in the case of one child, even from sexual abuse. The judge rejected S.V.'s contention that her limitations arose solely from "poverty." We agree.

It is plain that S.V. has been unable to provide for the children in the past, that they have all been harmed by her inability to do so, and that there is no presently foreseeable likelihood that she will be able to change that situation. Thus the first two elements of the termination statute have clearly been met. We reject, as did the trial judge, S.V.'s contention that DYFS has not offered her sufficient services and therefore has not met the third element. As to the fourth element of the termination statute, the judge found that termination would not do more harm than good. While the experts describe a caring relationship of at least four of

the children with their mother, they have clearly developed a more closely bonded relationship with their present caregivers.

The Supreme Court has emphasized "New Jersey's strong public policy in favor of permanency." *K.H.O.,* 161 *N.J.* at 357, 736 *A.*2d 1246. "Recognizing the natural tendency to want to continue working with parents to restore the family unit, we have cautioned that placement plans must not lose sight of time from the perspective of the child's needs. . . . The courts must consider the child's age, her overall health and development, and the realistic likelihood that the parent will be capable of caring for the child in the near future." *Ibid.* (internal citations omitted.)

We recognize, as did the trial judge, that despite S.V.'s long-term failure to function as a fit parent to these children, there is some positive connection between her and at least four of the children. Nevertheless, that connection is not as strong as the bond each child has with his or her present caregiver and proposed adoptive parent. It is apparently on the basis of her own connection to the children, and the fact that there is no provision in our law for "open adoption" (which would permit continued contact with the biological parent to be enforced), *see K.H.O.,* 161 *N.J.* 337, 361–62, 736 *A.*2d 1246 (1999); *In re Guardianship of D.M.H.,* 161 *N.J.* 365, 386, 736 *A.*2d 1261 (1999), that S.V. contends that DYFS should have considered the option of kinship legal guardianship and that the court should now do so.[3] *See N.J.S.A.* 3B:12A–1 to –7, enacted by L. 2001, c. 250, effective Jan. 1, 2002.

DYFS admits that it did not consider or discuss kinship legal guardianship with any of the children's caregivers. The judge was frank in stating that because the statute was so new, neither he nor the courts have had significant experience with it. He compared it to the statutory provision for permanent foster care for children over the age of twelve, that is, he viewed it as an

---

[3] Apparently, only one of the proposed adoptive parents has expressed a willingness to maintain the child's contacts with S.V. after termination.

exception to the termination/adoption mode of *N.J.S.A.* 30:4C–15.1, to be considered when adoption is not feasible.

The Legislature set forth its findings and intention in creating the new status of kinship legal guardianship. In *N.J.S.A.* 3B:12A–1,

The Legislature finds and declares that:

a. There is an increase in the number of children who cannot reside with their parents due to the parents' incapacity or inability to perform the regular and expected functions of care and support of the child;

b. An increasing number of relatives, including grandparents, find themselves providing care on a long-term basis to these children without court approved legal guardianship status because the caregivers either are unable or unwilling to seek termination of the legal relationships between the birth parent and the child, particularly when it is the caregiver's own child or sibling who is the parent. In these cases, adoption of the child is neither feasible nor likely, and it is imperative that the State create an alternative, permanent legal arrangement for children and their caregivers. One such alternative arrangement, which does not require the termination of parental rights, is a court awarded kinship legal guardianship that is intended to be permanent and self-sustaining, as evidenced by the transfer to the caregiver of certain parental rights, but retains the birth parents' rights to consent to adoption, the obligation to pay child support, and the parents' right to have some ongoing contact with the child;

c. In considering kinship legal guardianship, the State is seeking to add another alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights, for caregivers in relationships where adoption is neither feasible nor likely; and

d. Therefore, it is in the public interest to create a new type of legal guardianship that addresses the needs of children and caregivers in long-term kinship relationships.

It is apparent that kinship legal guardianship was created to meet a very specific need. *N.J.S.A.* 3B:12A–6d sets forth the required elements of proof:

The court shall appoint the caregiver as a kinship legal guardian if, based upon clear and convincing evidence, the court finds that:

(1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;

(2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;

(3) in cases in which [DYFS] is involved with the child as provided in [*N.J.S.A.*] 30:4C–85, (a) [DYFS] exercised reasonable efforts to reunify the child with the

birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely; and
(4) awarding kinship legal guardianship is in the child's best interests.

Nothing in the legislative history of this enactment suggests any disagreement with the "strong public policy [favoring] permanency." *K.H.O.*, 161 *N.J.* at 357, 736 *A.*2d 1246. The first element required by *N.J.S.A.* 3B:12A–6d as a basis for kinship legal guardianship essentially mirrors the definition of child neglect set forth at *N.J.S.A.* 9:6–1. The second element of *N.J.S.A.* 3B:12A–6d mirrors the second element of the termination statute: that circumstances are unlikely to improve within a reasonable time. *See N.J.S.A.* 30:4C–15.1b. The third element is a finding that adoption is neither feasible nor likely, and the fourth is that the guardianship is in the best interests of the child. Such a guardianship is clearly intended to formalize the status of a relative who agrees to take on responsibility for a child, *see N.J.S.A.* 3B:12A–4a(1), and can remain in place throughout the child's minority, *N.J.S.A.* 3B:12A–4a(6). Unlike a judgment terminating parental rights, kinship legal guardianship would not cut off the legal relationship of the parent and child. *N.J.S.A.* 3B:12A–4a(2)–(5). That is, the parent remains entitled to visitation and responsible for child support; she also has the right to seek termination of the guardianship and a resumption of custody if at a later date she is able to provide a safe and secure home for the child.[4]

■ After finding clear and convincing proof of each of the elements for termination, the judge also concluded that since

---

[4] A request for kinship legal guardianship can be initiated in several ways. A relative or family friend who is acting as a child's caregiver and who meets the definition set forth at *N.J.S.A.* 3B:12A–2 may initiate a petition for appointment as a kinship legal guardian. *N.J.S.A.* 3B:12A–5a. In a proceeding that has been initiated by DYFS pursuant to either *N.J.S.A.* 9:6–8.21 to –8.73 (abuse or neglect) or *N.J.S.A.* 30:4C–15, "only [DYFS] or the court shall as an a have legal standing to seek a kinship legal guardianship arrangement as an alternative disposition." *N.J.S.A.* 30:4C–87a. However, "[t]he parents of the child who is the subject of the complaint may request, with appropriate notice to [DYFS], that the court consider a kinship legal guardianship arrangement as an alternative disposition." *Ibid. See* L. 2001, c. 250, § 15.

adoption was feasible for these children, kinship legal guardianship would not apply. We agree. In our view, this newly-enacted statute is not intended as an equally available alternative to termination that must be considered in order to satisfy the third element of *N.J.S.A.* 30:4C–15.1. Rather, as DYFS has argued in its brief, it is an intended option where parental neglect and poor prospects for change in the foreseeable future are established, but adoption "is neither feasible nor likely," the child is in the care of "a family friend or a person with a biological or legal relationship with the child," *N.J.S.A.* 3B:12A–2, and therefore "kinship legal guardianship is in the child's best interest." *N.J.S.A.* 3B:12A–6d(4). Here adoption is both feasible and likely, making kinship guardianship inappropriate.[5]

If the Legislature deems it appropriate to provide for "open adoption," that is, for a biological parent to be granted an enforceable right to maintain contact with his or her child after the termination of parental rights pursuant to *N.J.S.A.* 30:4C–15.1, it is for the Legislature to take affirmative steps to enact such a provision. *See D.M.H.,* 161 *N.J.* at 386, 736 *A.*2d 1261; *K.H.O.,* 161 *N.J.* at 361–62, 736 *A.*2d 1246. We do not interpret the kinship legal guardianship statute as such a step.

Defendant seeks to further postpone permanent placement of her children, despite years of DYFS's involvement and her own failure to make the changes required to provide a safe, secure, and stable environment in which the children can thrive. As the Court said in *K.H.O.,* "parental fitness is the key to determining the best interests of the child. The considerations involved in determinations of parental fitness are 'extremely fact sensitive[.]' " 161 *N.J.* at 348, 736 *A.*2d 1246 (citing *In re Adoption of Children by L.A.S.,* 134 *N.J.* 127, 139, 631 *A.*2d 928 (1993)). The evidence here clearly supports the judge's best interests determination. We affirm the judgment terminating S.V.'s parental rights substantially for the

---

[5] The record also suggests that several of the related caregivers may be unwilling to cooperate with visitation for S.V. over a prolonged period.

reasons set forth by Judge Bovino in his oral decision placed on the record on October 11, 2002.

Affirmed.