# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4386-18T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

I.A.,

     Defendant-Appellant,

and

D.E.A.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.A.,
N.A., and K.A.,

     Minors.

_____

Submitted May 4, 2020 – Decided June 11, 2020

Before Judges Fasciale and Mitterhoff.

On appeal from the Superior Court of New Jersey,
Chancery Division, Family Part, Hudson County,
Docket No. FG-09-0212-19.

Joseph E. Krakora, Public Defender, attorney for
appellant (Deric D. Wu, Assistant Deputy Public
Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for
respondent (Melissa H. Raksa, Assistant Attorney
General, of counsel; Sara M. Gregory, Deputy
Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian,
attorney for minors (Meredith Alexis Pollock, Deputy
Public Defender, of counsel; Melissa R. Vance,
Assistant Deputy Public Defender, of counsel and on
the brief).

PER CURIAM

Defendant I.A. appeals the trial court's decision entered on May 23, 2019[1]

that terminated his parental rights as to his three minor children, Jimmy, Nicole,

and Kathleen.[2] The Division of Child Protection and Permanency (the Division)

received a referral alleging that there had been domestic violence between I.A.

and his wife, and that the children may have witnessed the violence. Following

---

[1] While the order also terminated the parental rights of the children's mother, D.E.A, she is not participating in the present appeal.

[2] We refer to the minor children with pseudonyms, and otherwise use initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d)(12).

a second referral and an investigation, the Division removed the children and placed them with their paternal grandparents after it determined that the parents' contentious relationship and unstable housing were harmful to the children. The Division referred the parents for numerous services, but eventually, pursuant to N.J.S.A. 30:4C-15.1, it filed a complaint seeking to terminate their parental rights, and to facilitate the children's adoption by the grandparents.

At trial, the court heard testimony from several witnesses called by the Division, including a caseworker and two expert clinicians. Ultimately, the court determined that the Division had satisfied the elements of N.J.S.A. 30:4C-15.1(a)(1) to (4) by clear and convincing evidence, and thus terminated the parental rights of both parents. The decision rested principally upon the parents' failure to remediate their personal problems and their contentious relationship, and their failure to secure stable housing

I.A. appeals, arguing that the trial court should have instituted a kinship legal guardianship (KLG) in lieu of terminating his parental rights, and that the Division failed to satisfy N.J.S.A. 30:4C-15.1(a)(4). Having reviewed the record, and in light of the governing legal principles, we affirm.

I.

Although the record in this case is extensive, we need not detail it exhaustively here. We summarize only the salient facts pertinent to our discussion. On August 26, 2001, I.A. and D.E.A. had a son, Jimmy. I.A. and D.E.A. married in September 2003. On January 14, 2004, the parents had a second child, Nicole. On April 20, 2013, the parents had their third and youngest child, Kathleen. It is well documented that two of the children have significant medical ailments and require specialized care. Jimmy sustained a cancerous brain tumor in 2012, which was treated with surgery. In December 2012, doctors discovered a separate benign tumor located between his liver and esophagus, which was treated with laser surgery at St. Joseph's Hospital. Additionally, Kathleen suffered from a seizure disorder stemming from an accident that occurred during her infancy.

As of the time of the guardianship trial in March 2019, the Division had been involved with the parents and their children for approximately two years. The Division initially removed the children from the parents' care in September 2017 after receiving referrals alleging that the children had witnessed domestic violence between the parents, and that D.E.A. was acting aggressively and had hit Kathleen. At the time of the removal, the children were already staying with

their paternal grandparents, and Nicole had been living with the grandparents since September 2016 because she could not handle the constant fighting between her parents. In addition to concerns of domestic violence, the Division sought the removal because the parents had been evicted from their apartment and were now living in a hotel without any current prospects for housing. Further, the Division had referred the parents for psychological and psychiatric evaluations, but the parents had failed to attend the scheduled evaluations despite the Division reminding them of their appointments on multiple occasions.

In the latter part of 2017, Jimmy and Kathleen suffered significant medical setbacks. As of November 2017, Jimmy had developed three inoperable tumors between his brain and spine, and was diagnosed with terminal cancer. He had received chemotherapy through Hackensack University Medical Center, but treatments had proven ineffective. In September 2017, Kathleen was diagnosed with both developmental delays and epilepsy, for which she was prescribed medication. She was evaluated at the Children's Specialized Hospital in December 2017, where she presented with speech delay, lack of coordination, and family discord. Doctors recommended that she participate in physical,

5 

speech and individual therapies; that a child study team evaluates her; and that she participate in educational services.

The Division filed a complaint of guardianship in the Family Part in October 2018. The evidence presented at the three-day trial reflected that both I.A. and D.E.A. had struggled to be effective parents. The evidence is replete with numerous instances of domestic violence between the parents that the children witnessed; an inability by the parents to provide a stable home for the children; bouts of unemployment; and perhaps most concerning, an unwillingness by both parents to address their own personal problems that preclude either from being a viable parent. Both parents have psychological difficulties, for which they have received some counseling.

The Division made numerous attempts over the course of this litigation to provide the parents with services and to reunify them with their children. The Division's key testifying witness at trial, psychologist Antonio Burr, conducted psychological evaluations of the parents and bonding evaluations between the children and the grandparents. Burr ultimately concluded that the termination of the parents' parental rights and adoption by the grandparents would not result in more harm than good, and that it would be in the best interest of all the children to remain with their grandparents.

A-4386-18T4

The record at trial showed the Division has provided substantial services to both parents.[3] In connection with the second referral to the Division, it drafted a family agreement in July 2017. Pursuant to the agreement, the Division offered to conduct spot checks and to coordinate the parents' meeting with a domestic violence liaison, and recommended that the parents attend treatment for anger management and family counseling. The Division also referred the parents for individual therapies at Rocio Botero Day (RBD) in February 2017,[4] and for an assessment at Bridgeway Rehab Services in May 2018, where staff recommended that both parents attend individual therapies, and that I.A. be prescribed antidepressants. Psychiatrist Samiris Sostre also evaluated the parents on two separate occasions between September 2017 and January 2019, and Burr evaluated the parents in December 2017. The Division also scheduled both parents for psychological reevaluations and bonding evaluations with Burr in January 2019.

---

[3] Additionally, after an initial investigation by the Division stemming from a referral made in June 2017, which concluded with no findings of abuse or neglect by the parents, the Division provided the family with information for community resources and miscellaneous services at Catholic Charities, Christ Hospital, Perform Care, and Palisades Family Success Center.

[4] Individual therapies would have continued at RBD until a therapist deemed it safe to admit the parents to couples' therapy.

In addition, up through the time of trial, the Division supported visitation between the parents and the children through Family Advocacy Program and through Catholic Charities. While Nicole never wanted to visit with her parents, the parents had visitation with Jimmy and Kathleen. However, as of September 2018, Jimmy decided that he no longer wished to attend these visitations because the parents would spend a significant amount of time questioning Kathleen about her conditions at the grandparents' home and her interactions with her young cousin, whom I.A. repeatedly alleged was abusing Kathleen.[5] This came at the expense of Jimmy, who the parents interacted with only minimally.

Further, neither parent has consistently taken advantage of the services provided to them. With regard to housing, the Division urged the parents to seek temporary shelter through welfare prior to them being evicted from their apartment. After their eviction, the Division provided the parents with information about Jersey City Housing and Garden State Episcopal, a program that caters to the homeless, while also urging them to apply for housing through the Union City Housing Authority.[6] The parents chose not to explore any of

[5] I.A. made these allegations on numerous occasions, but they were never substantiated.

[6] While it is unclear from the record, we may assume that this application was for enrollment in a subsidized or low-income housing program.

these opportunities. Additionally, the parents inconsistently attended visitations with their children, eventually leading to their discharge from Catholic Charities in January 2019 for missing too many supervised visitations. The parents were similarly discharged from RBD in December 2018 for missing too many individual therapy sessions, and throughout this litigation the parents attended Division-run meetings and appointments inconsistently and showed up late on multiple occasions. Tellingly, Burr was unable to conduct psychological reevaluations or bonding evaluations of the parents, as neither chose to attend these appointments.

As of the time of trial, the parents did not have stable housing. The judge explained that the parents had moved between several hotels, and at one point were even living in their car. The judge noted that this was despite the Division offering to assist the parents with housing on multiple occasions.

After considering this and much more extensive evidence, the trial judge concluded that the Division had proven all four prongs of the termination statute by the level of clear and convincing evidence required by N.J.S.A. 30:4C-15.1(a). In particular, the judge found the expert opinions of the Division's expert, Burr, to be persuasive, and accepted his clinical findings, which the parents failed to counter with testimony from a competing defense expert. The

judge found significant the Division's considerable efforts to stabilize the family, and to provide services, all of which were unsuccessful in reunifying the children with their parents.

The judge noted the close bonds between the paternal grandparents and the children, and she found that there was mutual interest for the grandparents to adopt the children. The judge found the termination of the parents' rights to enable such adoption consistent with the children's best interests. This appeal ensued.

On appeal, I.A. does not contest the trial judge's rulings with respect to N.J.S.A. 30:4C-15.1(a)(1) or (2). I.A. argues on appeal that the trial judge should have implemented a KLG in lieu of terminating his parental rights, and that the Division failed to satisfy N.J.S.A. 30:4C-15.1(a)(4), as the termination of his parental rights would do more harm than good for the children.

II.

We begin our discussion with the well-settled legal framework regarding the termination of parental rights. Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, that right is not absolute. N.J. Div. of Youth & Family Servs. v. R.G.,

217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test to determine when it is in the child's best interest to terminate parental rights. In order to secure parental termination, N.J.S.A. 30:4C-15.1(a) requires the Division to prove four prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

A-4386-18T4

See also <u>A.W.</u>, 103 N.J. at 604-11. The four prongs of the test "are not discrete and separate" but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." <u>K.H.O.</u>, 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." <u>Ibid.</u> (quoting <u>In re Adoption of Children by L.A.S.</u>, 134 N.J. 127, 139 (1993)).

Our review of a family judge's factual findings is limited. <u>Cesare v. Cesare</u>, 154 N.J. 394, 411-12 (1998). "When a biological parent resists termination of his or her parental rights, the [judge's] function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." <u>N.J. Div. of Youth & Family Servs. v. R.L.</u>, 388 N.J. Super. 81, 87 (App. Div. 2006). The factual findings that support such a judgment "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" <u>In re Guardianship of J.T.</u>, 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting <u>Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am.</u>, 65 N.J. 474, 483-84 (1974)). "[T]he conclusions that logically flow

from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." R.L., 388 N.J. Super. at 89.

## III.

First, I.A. argues that the trial judge failed to consider KLG as a viable alternative to terminating his parental rights. I.A. also contends that the Division pressured and coerced the grandparents to adopt the children, when the grandparents' initial desire was to act as kinship legal guardians.

We briefly summarize, in chronological form, the relevant facts drawn from the record that relate to the use of KLG in lieu of adoption. On June 6, 2018, Division Caseworker Collazo Milagros met with the grandmother and discussed the differences between adoption and KLG. Milagros explained the terms and provided an informational packet, asking that the grandmother share the information with the grandfather. The grandmother affirmed her understanding and that she remained "100 percent committed to the children."

The following day, the grandmother called Milagros asking for additional information about the differences between KLG and adoption, and expressed the grandparents' belief that the best option under these circumstances for the family would be KLG. She also stated that the grandfather felt guilty, because he felt as though the grandparents were "taking the kids away from [I.A.]" Milagros

responded that the Division was still seeking to terminate the parental rights of I.A. and D.E.A., but that she would speak to her supervisor to inquire about other options.

Thereafter, on December 27, 2018, Division Caseworker Teresa Espinal met with the grandparents during an oncology appointment for Jimmy. At the meeting, the grandmother inquired whether there was an alternative to adoption in which the grandparents would retain custody. The grandmother made the request based on concerns that the grandparents would be unable to pay the mounting costs for school and medical care for Jimmy and Nicole. Espinal informed the grandmother that if the grandparents could not care for the children long term, the Division would need to find separate resource parents to adopt the children or place the children in a foster home, as the Division was seeking guardianship of the children and to terminate the parents' parental rights. Espinal added that although the Division was considering subsidizing the children's care, nothing was guaranteed. The grandmother stated that she did not want the Division to remove the children or to place them in foster care, and reiterated that she wanted to care for the children.

At trial, two of the Division's witnesses offered testimony clarifying the grandparents' position on adoption. Espinal testified on direct that she had last

14

spoken to the grandparents on March 1, 2019, during which time she provided them with information regarding the prospects of KLG versus adoption. Espinal stated that the grandparents had initially preferred KLG because they wanted to preserve the parents' parental rights, even though the grandparents and children had mutual interest in adoption. However, Espinal explained that the grandparents fully understand why the parents are unable to care for the children, and have since changed their plans because of their grandchildren. Thus, Espinal confirmed that although the grandparents idealistically did not want the court to terminate the parents' parental rights based on their personal relationships with the parents, they were now seeking to adopt the children. Neither parents' attorney chose to cross-examine Espinal as to this testimony.

Burr also testified on direct that the grandmother had initially wanted to retain custody of the children under circumstances that would be amicable to the parents, particularly to preserve their relationship with I.A. However, Burr explained that while the grandparents said at the bonding evaluation that they would adopt "if there's no other way," this initial apprehension was legitimate based on their relationship with the parents. According to Burr, the grandparents' main concern was the best interests of the children, and they would

A-4386-18T4

be willing to do everything necessary to care for the children, which overrides any initial reluctance or apprehension on their part.

As to the prospect that KLG would be more appropriate than adoption, the judge determined that based on the evidence adduced at trial, it would not be a viable option under the circumstances. The judge explained in her written opinion that although the grandparents were initially open to KLG because they were sympathetic towards their son and did not want to feel as though they were taking the children from him, their overriding concern was the best interests of the children. The judge accepted Espinal's testimony that the grandparents eventually decided to adopt the children, "as the children and their needs take priority." The judge found that this change of heart was influenced by the grandparents' discussions with Jimmy and Nicole, who expressed that they wanted to be adopted. The judge also accepted the testimony of Burr, determining that the grandparents ultimately understood that their protective responsibilities to the children take precedence over their wishes to maintain an amicable relationship with the biological parents, and that they wanted to do what is necessary to protect the children. The judge also concluded that KLG would not be in the best interests of the children.

Based on these facts, we disagree with I.A.'s argument that KLG was a viable option in lieu of terminating the parents' parental rights. "The decision of a resource parent to choose adoption over KLG must be an informed one." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 260 (App. Div. 2019). "The Legislature has made it clear that relative caretakers who might be candidates for KLG must be adequately informed of the nature of such arrangements and the financial and other services for which they may be eligible." Id. at 261. To accomplish this objective, the Legislature enacted the KLG Notification Act, N.J.S.A. 30:4C-89 to -92, in 2005. The Legislature enacted the KLG Notification Act "to ensure that individuals who may be eligible to become kinship legal guardians are aware of the eligibility requirements for, and the responsibilities of, [KLG] and . . . [also] the services available to kinship legal guardians in the State." N.J.S.A. 30:4C-90(e). To accomplish this goal, the Division shall, in easily understandable language:

> a. inform individuals, of whom the department is aware, who may be eligible to become kinship legal guardians of:
>
> (1) the eligibility requirements for, and the responsibilities of, [KLG]; and
>
> (2) the full-range of services for which kinship legal guardians may be eligible and the eligibility requirements for those services; and

A-4386-18T4

b.  inform current kinship legal guardians of the full-range of services for which kinship legal guardians may be eligible and the eligibility requirements for those services.

[N.J.S.A. 30:4C-91.]

A logical implication of the Notification Act is that the caregiver must be fully informed of the potential benefits and burdens of KLG before deciding whether he or she wishes to adopt.  Once he or she is provided with that comparative information, the caretaker's preference between the two alternatives should matter . . . .  The caregiver's consent to adopt should be not only informed, but also unconditional, unambiguous, and unqualified.

[M.M., 459 N.J. Super. at 263-64.]

However, "a caregiver's preference, if any, of KLG over adoption [is] a relevant but not dispositive consideration." M.M., 459 N.J. Super. Id. at 264.

We have previously said that a KLG "is not intended as an equally available alternative to termination that must be considered in order to satisfy the third element of N.J.S.A. 30:4C-15.1[(a)]." N.J. Div. of Youth & Family Servs. v. S.V., 362 N.J. Super. 76, 88 (App. Div. 2003).  In that regard, N.J.S.A. 3B:12A-6(d), which establishes the proof required for the court to appoint a caregiver as a kinship legal guardian, specifies that where the Division is involved, a kinship legal guardian shall only be appointed where "adoption of the child is neither feasible nor likely." N.J.S.A. 3B:12A-6(d)(3); see N.J. Div.

of Youth & Family Servs. v. P.P., 180 N.J. 494, 512 (2004) ("[KLG is] a more permanent option than foster care when adoption 'is neither feasible nor likely' and '[KLG] is in the child's best interest.'") (quoting N.J.S.A. 3B:12A-6d(3)-(4)).

In S.V., where caregivers were initially reluctant to adopt, we nonetheless found that adoption was appropriate instead of instituting KLG where the Division later presented evidence showing that all such caregivers were now interested in adoption. 362 N.J. Super. at 81, 88-89. We stressed that all elements of N.J.S.A. 30:4C-15.1 had been met, and that adoption was both feasible and likely. Id. at 88.

We find that the trial judge properly determined that KLG was not viable in this matter.[7] While I.A. disputes the testimony of the Division's witnesses that the grandparents ultimately wanted to adopt the children, the trial judge was permitted to rely on this testimony based on her finding that those witnesses were credible, see J.T., 269 N.J. Super. at 188, and we defer to those findings.

---

[7] We also find no evidence in the record supporting I.A.'s position that the Division pressured or persuaded the grandparents to adopt the children. When the grandmother expressed reservations about adopting, Espinal conveyed the Division's position that it still intended to terminate the parents' parental rights and place the children with resource parents who would be able to care for the children. We discern no wrongful intent from such conduct, nor do we find that this information pressured the grandparents to adopt.

See <u>R.L.</u>, 388 N.J. Super. at 89. I.A. was free to offer contrary testimony at trial or to cross-examine the Division's witnesses on this issue, but did not do so.

Based on her findings of credibility, the judge properly determined that the grandparents' decision was informed, unconditional, unambiguous, and unqualified. <u>See</u> <u>M.M.</u>, 459 N.J. Super. at 263-64. Regardless, the grandparents' preference is not dispositive as to whether KLG would have been a viable alternative to adoption, <u>see</u> <u>id.</u> at 264, and the availability of such an arrangement has no bearing on the judge's finding that there is an alternative to adoption. <u>See</u> <u>S.V.</u>, 362 N.J. Super. at 88. Burr's testimony adequately supported both that adoption was feasible based on the relationships between the grandparents and the children, and that adoption by the grandparents would be in the children's best interests, and the judge accepted this testimony. <u>See</u> <u>P.P.</u>, 180 N.J. at 512.

Further, we have recognized that resource parents may naturally have reservations to adopting, <u>see</u> <u>M.M.</u>, 459 N.J. Super. at 274 (citing <u>S.V.</u>, 362 N.J. Super. at 81, 87-88), and such reluctance is likely present where the biological parents are closely related to the resource parents. Here, the grandparents' initial reservations were almost entirely related to their desire to maintain an amicable relationship with their son, who could harbor resentment towards them for what

he may perceive as stealing his children. The record supports that the grandparents' overriding concern was the children's best interest, and that they were committed to adopting the children. As the judge found that N.J.S.A. 30:4C-15.1 had been met, and that adoption was both feasible and likely, we affirm the trial judge's finding that a KLG was not a suitable option under the circumstances. See S.V., 362 N.J. Super. at 88.

Next, I.A. argues that the Division failed to satisfy N.J.S.A. 30:4C-15.1(a)(4), claiming that the termination of his parental rights would be harmful to Kathleen, and would provide little benefit to Jimmy or Nicole.

We summarize the facts relevant to this prong as follows. On December 12, 2017, psychologist Antonio Burr evaluated both parents. Burr concluded that because the parents share a highly dysfunctional relationship, it would be unlikely that they could establish a viable parenting plan at any point in the foreseeable future. He determined that their marital relationship was not sustainable, and that this precluded them from being able to plan jointly or parent their children as a family. Burr thus concluded that the children should remain with the grandparents, and recommended that the parents both attend couple's counseling so that they could either jointly or independently improve their parenting plans.

As to I.A., Burr found that the domestic violence between the parents arose from arguments caused by his beliefs that D.E.A. was acting unfaithfully, even though she denied cheating on him. Burr also found that I.A. seemingly had no expectation that he would need to independently procure housing for himself or the children, and that he solely blamed D.E.A. for the family's situation. Burr recommended that I.A. continue with the Division's services at the time.

On January 17, 2019, Espinal explained to the parents that they were scheduled for psychological reevaluations and bonding evaluations with Burr on January 30, 2019. However, both parents failed to attend these evaluations on the scheduled date. This limited Burr's ability to evaluate the parents' progress after attending services, as well as his ability to determine whether the children were bonded with their parents.

On February 7, 2019, Burr conducted a bonding evaluation between the grandparents and the children. Jimmy and Nicole both expressed that they did not seek regular visitation with their parents and wished to be adopted by their grandparents. While Kathleen expressed that she enjoys seeing her parents, Burr did not seek her opinion on the termination of her parents' parental rights or the

prospect of adoption, given her young age and developmental hindrances.[8] Based on the interactions between the children and the grandparents, Burr concluded that the "grandparents are committed and are able to provide these children with an adequately structured and ordered home environment."

Burr also determined that the grandparents are attentive to the children's emotions and reactions, and "are capable of meeting the children's needs for attention, soothing, and nurturing care." Specifically as to Jimmy, he found that the grandparents "attend effectively to his ample medical needs." As such, Burr opined that the children are attached to the grandparents and view them as their "primary parental figures on whom they depend to have their physical and emotional needs met." He thus concluded that the children have a greater likelihood for permanency with the resource parents than with their biological parents.

As the parents had declined to undergo bonding evaluations, Burr determined from their psychological evaluations, as well as his bonding evaluation between the grandparents and the children, that the termination of the parents' parental rights and adoption by the grandparents would not result in

---

[8]  At trial, Burr testified that Kathleen nonetheless views the grandparents as "benign parental figures," and still relies upon them for daily care.

more harm than good. Specifically as to Kathleen, Burr commented that to remove her from the grandparents would result in confusion, loss of focus, and unstable emotionality, and that there was no evidence that either I.A. or D.E.A. were equipped to address these concerns. In contrast, Burr opined that the grandparents would be able to resolve any immediate or long-term negative effects Kathleen would suffer from the termination of the parental rights of the parents, and that her older siblings could assist her during this process.

Here, based on Burr's clinical evaluations, we disagree with I.A.'s argument that the Division failed to show that the termination of his parental rights would do more harm than good. To satisfy N.J.S.A. 30:4C-15.1(a)(4), the Division need not "show[] that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, the issue "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid. The underlying concern of the fourth prong is the child's need for permanency within a reasonable amount of time. J.C., 129 N.J. at 26.

To satisfy this prong, "[the Division] must 'offer testimony of a well-qualified expert who has had full opportunity to make a comprehensive,

objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents.'" N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 442 (App. Div. 2009) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)). A comparative bonding evaluation between a child and her natural parent is generally required because the child's relationship with foster parents "must be viewed not in isolation but in a broader context that includes . . . the quality of the child's relationship with his or her natural parents." Id. at 439 (alteration in original) (quoting J.C., 129 N.J. at 18).

We find that the trial judge properly concluded that the termination of I.A.'s parental rights would not do more harm than good to the children, and affirm for substantially the same reasons expressed by the judge. In reaching her conclusion, the judge correctly found that the children would suffer more harm from the disruption of their relationship with their grandparents than they would with the severing of their relationship with their parents. See K.H.O., 161 N.J. at 355. While I.A. contends that to sever his relationship with the children is also harmful, particularly for Kathleen, this is not the controlling standard. See ibid.

The judge correctly emphasized the need for permanency and stability in the children's lives, see J.C., 129 N.J. at 26, and based her conclusions on Burr's findings, which he rendered after conducting bonding and psychological evaluations. See A.R., 405 N.J. Super. at 439, 442. In this regard, the trial judge's conclusion was based on ample credible evidence in the record, see J.T., 269 N.J. Super. at 188, and we thus defer to the judge's determination that to terminate I.A.'s parental rights would not do more harm than good to the children. See R.L., 388 N.J. Super. at 89.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION