# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1314-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

D.S.,

     Defendant-Respondent.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
X.S., a Minor,

and

D'A.S., a Minor,

     Respondent/Cross-Appellant.

_____

     Argued telephonically June 24, 2020 –
     Decided August 11, 2020

     Before Judges Accurso and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FG-20-0026-18.

Sara M. Gregory, Deputy Attorney General, argued the cause for appellant/cross-respondent (Gurbir S. Grewal, Attorney General, attorney; Donna Sue Arons and Melissa H. Raksa, Assistant Attorneys General, of counsel; Elizabeth Erb Cashin, Deputy Attorney General, on the briefs).

Todd S. Wilson, Designated Counsel, argued the cause for respondent/cross-appellant D'A.S. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Todd S. Wilson, on the briefs).

Ted Gary Mitchell, Deputy Public Defender, argued the cause for respondent D.S. (Joseph E. Krakora, Public Defender, attorney; Ted Gary Mitchell, of counsel and on the brief).

Nancy P. Fratz, Assistant Deputy Public Defender, argued the cause for minor X.S. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Nancy P. Fratz, on the brief).

PER CURIAM

The Division of Child Protection and Permanency and the Law Guardian for sixteen-year-old David[1] appeal from a November 1, 2018 order terminating this guardianship litigation based on the trial judge's decision that the Division

---

[1] The boys' names and that of the resource parent are fictitious. We employ pseudonyms to protect their privacy. See R. 1:38-3(d)(12).

failed to prove the second and fourth prongs of the best interests standard, N.J.S.A. 30:4C-15.1(a), at trial. The Law Guardian for David's twin brother, Samuel, although urging termination at trial, now sides with the boys' father, defendant D.S., urging that we affirm. Because we are convinced by our review of the record that the trial court failed to apply the correct legal standard in analyzing the second and fourth statutory prongs, frustrating the paramount goal of permanency, and erroneously excluded the opinion of the Division's testifying psychologist, we vacate the order and remand for expedited proceedings to bring this case to conclusion.

The issue in this appeal is the judge's interpretation of the second and fourth prongs of the best interests standard applied to the facts. The facts themselves are almost entirely undisputed. Neither defendant nor the Law Guardians presented any evidence at trial, and the judge found the Division's witnesses competent and credible, with the exception of his rejection of Dr. Dyer's opinion on the boys' need for permanency, which is at the center of the case. Defendant did not testify and absented himself for part of the trial.

Here are the essential facts. The boys lost their mother when they were not yet three. Their father, defendant D.S., has long-standing mental health problems that have seriously affected his ability to care for his sons.

Defendant has never held an identifiable job, and the Division has never had more than a temporary address for him, although it's been involved with defendant and his sons for over ten years now. The boys' teachers reported the boys missed school and Samuel sometimes appeared dirty, smelly and hungry. Samuel also reported some fear of his father, whom he claimed hit him when he didn't do well, or things didn't go right.

The boys lived with a girlfriend of defendant's for some unspecified time and his sister may have likewise had a custody order in her favor at some point, but they were not removed from his care until December 2012, after defendant was twice substantiated for abuse and neglect.[2] The boys were then eight-years-old. They were placed with their maternal grandmother, who kept them for over two years while the Division tried to effect reunification. David and Samuel were returned to their father's care in February 2015, but the reunion was brief, lasting only three months. The Division removed the boys again after defendant failed to pick them up from an after-school program. Defendant told police at 7:00 p.m. that he was on his way over, but he never

---

[2] The trial judge's decision to not "clutter the record" with the worker's contact sheets and summaries has made some of the specifics of the history difficult to ascertain. Although annoying, it has not impeded our review.

arrived. He was apparently so drunk he didn't realize the children weren't home until the following morning.

The boys could not be placed with their grandmother again on account of her advancing dementia. No other relatives were available, so the Division placed the boys in a resource home with "Ms. K," who has cared for them since and wishes to adopt both boys.

Although referred by the Division to a myriad of programs, defendant has never meaningfully engaged in mental health or substance abuse treatment, although the experts opined he needs both. Defendant's failure to even return for a follow-up appointment prevented the Division's psychiatric expert from offering more than a "rule-out" diagnosis. Dr. Sostre testified that defendant is enormously suspicious and guarded and his thoughts so disorganized that it is difficult to have a normal conversation with him. She had no doubt defendant suffered from a mental disorder, manifested by a "detachment from reality," but could not say whether it was a psychotic disorder, a bipolar disorder, or paranoid personality disorder. She did offer that defendant's thoughts were so disorganized that she would be concerned with him having any children in his care, no matter their age, "[e]ven if they were 17 years old."

A-1314-18T3

Before talking about the remainder of the trial testimony, we divert to address something about the procedural history, which appears to have colored the judge's analysis of the issues. The Division first brought this case to trial in 2017. After the Division presented the testimony of at least one witness, the parties engaged in mediation to explore the possibility of kinship legal guardianship, "an alternative permanent placement option without the need for termination of parental rights and 'where adoption is neither feasible nor likely[.]'" N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 223 (2010) (quoting the Kinship Act, N.J.S.A. 3B:12A-1(c)).

That solution was abandoned when the resource parent, Ms. K, determined she was not prepared to partner with defendant after he showed up drunk at her house one Sunday morning at 6:00 a.m., demanding to see the boys. Defendant was yelling something about not letting anyone bully his sons and wanted to accompany them to school. Ms. K explained it was Sunday, and there was no school. Defendant insisted it was Friday. He appeared again the following night, pursuing the same theme. Because the Division believed the boys were against adoption at that point, the guardianship was not immediately reinstated.

A-1314-18T3

After the Division reinstated the guardianship action in January 2018, counsel were before the court on the order to show cause explaining that the twins, who were then thirteen, had different views on adoption. David wanted to be adopted by Ms. K, while Samuel wanted to remain with her but not be adopted. Counsel for defendant expressed frustration with Ms. K's rejection of KLG, defendant's preferred resolution.

> KLG was accepted by this foster parent. And, then, all of a sudden, I don't know what happened. She says she doesn't want it anymore. This — this is the tail wagging the dog. Is — is she in charge of this? That — does the Division have anything to say? Do the children's opinions mean anything? Is — is it just this woman that says one day, "KLG, I think, is great." The next day, "KLG is not so great." You know? We — I hear about backlogs, this is the kind of thing that backlogs our courts. Cases that don't need to be tried. Somebody has got to sit down and tell these foster parents, you know, which is it? You can't just be playing with people's lives. It makes her feel better. I read all sorts of documents about what this woman says. It will make her feel better. Well, it's not her that has to feel better. It's the children. One of them specifically says, "I don't want to be adopted." And I thought we had the perfect solution. Kids that don't want to be adopted, a woman willing to do KLG, we'll do KLG. Well, if she doesn't want to do KLG anymore, then return these children. We'll find somebody who probably wants the best of both worlds for these children.

The judge responded to counsel's statement as follows:

7

Well, there's a part of me that understands precisely what [counsel for defendant] is saying. And I don't know — I don't really see the huge difference between KLG and adoption. And the closer a child gets to age 18, and these children are 13 — 13 and a half, I — I just can't see — and they obviously know their father. Father is interested in them. I just really don't — don't see the distinction between adoption and KLG, by that point, becomes almost meaningless. Because the only basic fundamental difference is, in adoption, the — the adopting parents get complete discretion as to whether or not the children will see — have any time at all, or any contact with the father. And, in KLG, the judge gets to decide that. So, that's the only difference. I don't get it.

When defense counsel again expressed his frustration with having to go forward, the judge ended the discussion by saying:

Did you just hear me explain how little difference there is between KLG and adoption? And how the children get older the less difference there is between those two things? . . . I'm going to repeat it. Termination is a last resort. That's the last thing we want to do. Period.

When the case came on for trial, the Division presented two fact witnesses who testified about their observations of defendant's relationship with his sons, Samantha Maytidu, a licensed masters mental health clinician, who oversaw defendant's therapeutic visitation of his sons for Cooperative Counseling Services, and Leonard J. Cusumano, the adoption worker assigned to the family.

Maytidu testified that defendant rarely missed a weekly visit with his sons, that the visits often went well because there was genuine affection among the three of them, but that defendant also often acted or spoke in ways that were inappropriate, causing her to have to counsel and redirect him, with varying degrees of success. Maytidu explained the counseling service does not permit parents "to discuss court proceedings," or to "speak negatively about the children's resource parent," and "also [doesn't] expect that the parent is going to disclose and discuss hardships of their own in front of the children."

Maytidu testified defendant often had difficulty following those rules, especially the last one. She explained that defendant could sometimes be so inappropriate, blaming the children, particularly Samuel, for things clearly not their fault, that Samuel would cry. Asked for an example, she recounted a time recently when defendant "agitated and upset" over having been discharged unsuccessfully from his mental health day program, "ended up telling [Samuel] that it was his fault that the program had discharged" defendant.

Maytidu testified defendant appeared to favor David, having "higher expectations" for him and paying him more attention during visits "either doing his hair, or talking about his grades or his sports rather than focusing on

both children evenly."  In contrast, defendant would sometimes "just display so much anger onto [Samuel], where he would tell [Samuel] it's your fault, I'm kicked out of my program.  It's your fault that you and your brother are not with me anymore."

Maytidu testified that "obviously, as a child, when you're — you're hearing that from your parent, whom you love, it's hard.  It's hard for a child to understand."  She testified such episodes occurred often.  Although she would try to explain to defendant "that it's not appropriate to discuss these [problems] with your children, because there's nothing — they don't have control.  They can't help you, and it puts a burden on them, emotionally, and psychologically," she could not make defendant understand how his actions affected his sons.

According to Maytidu, David and Samuel are very different, and responded differently to their father's complaints about his hardships and difficulties.  "[S]o — while [David] is still impressionable, he does not present as vulnerable as [Samuel].  He does not present as emotional as [Samuel] and he's able to articulate a little bit more than [Samuel] can."  Maytidu described Samuel as "a lot more vulnerable, more impressionable and much more parentified."  Asked to explain, she testified that in "the child/parent dynamic,

it's the parent who usually is the one to attend to the child's emotional needs, physical needs, psychological needs." With a child who is parentified, there's "a role reversal between parent and child." Here, in Maytidu's view, Samuel has been made to feel responsible for his father.

Maytidu referred to a visit following Father's Day as an example. According to Maytidu, defendant was irate because the children had neglected to reach out to him on the holiday. Defendant "made inappropriate statements toward his children," and also complained that he was "broke, and he ha[d] no electricity, and no place to sleep, and disclosed his hardships — his financial hardships, his unstable financial ability, his housing, and just repetitively kept saying to them that it was unacceptable that they didn't reach out to him despite him just celebrating their birthday with them."

Although both boys told Maytidu that they were used to his rants, David told her in June 2018 that he wanted "normalcy" and "not having the Division, essentially, control his life." He explained that "coming to these visits," while allowing him to see "his father, . . . also put a barrier between the things that were important to him," such as sports and going to games. Maytidu saw Samuel, on the other hand, surreptitiously pass his father money under the table once when defendant told him he needed money.

Maytidu testified she never saw defendant "put his hands" on either boy, but that he would threaten to do so on occasion, causing Samuel, who had previously claimed his father beat him, to be fearful and cry. When she confronted defendant, he told her "he didn't care that [she] was there, that if, you know, he needs to hit them, like, he will, regardless of the circumstance or who is present, or who is watching." Cooperative Counseling Services ended their oversight of defendant's visits shortly before the re-scheduled guardianship trial in July 2018, when defendant made a reference to "going postal" when Maytidu tried to talk to him about the trial. Those remarks prompted defendant's two-week involuntary commitment to a mental hospital and the adjournment of the guardianship trial for three months.

Cusumano, the adoption worker, testified to defendant's minimal compliance with services, Cusumano's observations of defendant with his sons, the boys' life with their resource parent, and their changing views on adoption during the almost three years he worked with the family. Cusumano stressed that it was "very hard" to describe his conversations with defendant. He described defendant's conversational style as "tangential in nature." They would one minute be discussing "something that's serious like we'll talk about a service or we'll talk about maybe finances or something of that nature, and

12

then it's going to be about this persecution kind of field, and then it just goes on — it snowballs out of control."[3] Cusumano explained "it was always very, very difficult to get real salient information" from defendant and Cusumano was never "entirely sure that [defendant] got the message that [Cusumano] was trying to relay."

Cusumano had observed several recent visits between defendant and his sons. He testified the visits had been generally positive but noted a marked change in Samuel's interaction with his father, in that he recently "stood up for himself" more, and was less inclined to "do[] as he was immediately instructed."

Cusumano testified the boys were "thriving" in Ms. K's care. He described the relationship between the boys and Ms. K as very warm, and that they had developed "a comradery with one another to where they would be able to joke, and tease, and, you know, play . . . like just normal like family interaction." Cusumano agreed that Samuel was "the more emotional" of the brothers, and that Ms. K, who the boys referred to as "Ma" or "Grandma,"

---

[3] Cusumano testified that defendant was enormously defensive and often responded to suggestions for services as an insult to his intelligence, or "[Cusumano] as a white man coming at him." Defendant was also resistant to a medication regimen, believing "the medicines may have been concocted with things that could get him in trouble, like THC or alcohol."

"kind of coddles him a little bit more on that level, because he has that emotionality about himself." Cusumano testified that Samuel was doing better in school, "had a good understanding" of Ms. K's expectations of him and worked to meet them, adhering to the rules she established.

As for David, Cusumano described him as a gifted athlete, "almost 6'2" and likely has room to grow a ton more." Cusumano explained that Ms. K can't impress on David enough "that he needs to be able to focus on school in the event that an athletic career cannot be achievable," but also goes to all of his games, "yelling, and, you know, being the fan. So, she . . . presents that element" in David's life.

Cusumano testified that Ms. K has adult children and that her daughter and her family live a block away. Ms. K's grandson, Eric, who is in his mid-twenties, "is very involved with the boys," playing video games with them and taking them places. He's helped David get involved with AAU basketball, and acts, not only "like the big brother" but as a mentor to both boys.

Cusumano explained that he had several conversations with the boys about "permanency planning." In January 2017, when he asked David how he felt about adoption, David told him "he did not care so long as he could see his

father." David also said "he felt safe and comfortable" living with Ms. K and felt close to her and her family.

A few months later in April, after the Division had dismissed the guardianship, David asked him what was going on with the adoption. Cusumano told him it was "off the table" because neither he nor his brother wanted to be adopted. David immediately replied that that was not true as far as he was concerned, and that, so long as he didn't have to change his last name, he wanted to be adopted by Ms. K.

Cusumano had a conversation around the same time with defendant about his desires. Cusumano noted defendant "did not feel he was capable of taking custody of his children, but he was opposed to adoption because he thought there would be some middle ground, where he could continue to have contact with his children." Cusumano testified it was clear to him through conversation with defendant that "he did not really understand KLG," but thought it "was a good idea."

In May 2018, Samuel told Cusumano he didn't "mind being adopted," but had reservations "because he didn't want his . . . dad to feel that he was choosing one side over the other." He also didn't want to be known "as the adopted kid." Notwithstanding, his father's feelings, Samuel thought adoption

15

by Ms. K would be a "better plan" for himself. David was clear that he wanted to be adopted. The boys argued briefly, with David accusing Samuel of being responsible for the delay in the case by going "back and forth" about adoption. Cusumano immediately corrected that misconception, explaining to both boys that Samuel's feelings about adoption were not a contributor to the delay in the case.

Cusumano testified that David remained disturbed by how long everything was taking. Cusumano explained that David's AAU team had upcoming tournaments in Baltimore and somewhere in California, and David was frustrated that in addition to "Ma's" approval, he needed to secure the okay of the Division to go. David told Cusumano, "I just want this to be over, and . . . to be normal." Cusumano testified David was getting "more fed up" with the Division's involvement in their lives and his situation remaining unsettled.

Cusumano talked to both boys again about adoption in June 2018, in advance of the July trial date, Samuel reiterated, on balance, that he'd prefer adoption by Ms. K. Weighing the pros and cons, he'd decided living in a home is better than "being on the streets." David likewise remained committed to adoption.

Cusumano testified that the Division's plan for the boys was adoption by Ms. K.  Asked why, he responded:  "[b]ecause she has provided this environment, this stable home.  She's [been] able to meet all of the children's basic needs, and — and other needs that aren't identified as basic needs."  Ms. K has provided the boys "consistent direction" and "a loving home."  Cusumano also stressed that Ms. K has the support of her family, and particularly of her grandson, Eric, who has become an important figure in the boys' lives.  Cusumano explained that Ms. K and Samuel and David have just become this tight knit "little family."  He again described both boys as "thriving" in Ms. K's care.

Ms. K also testified.  She immigrated to the States from Africa, and reading the transcript makes clear English is not her first language.  She testified that both Samuel and David were doing "[v]ery well.  In school and activities and my house they are doing very well."  She explained that when the boys first arrived, both misbehaved for about two months, Samuel more seriously than David.  Samuel "had a temper" and would "get mad" and throw fits.  Ms. K explained that "[y]ou know, I figure out if it's my grandson I wouldn't throw him out.  I have to take care of him.  So, I make sure he calm down, and feeling good."  Now both boys are doing better in school, David

17

making the honor roll and Samuel getting close. The boys clean their rooms, take turns taking out the garbage and even do their own laundry.

Asked about her plans for Samuel and David, Ms. K replied:

> My plan for them to go to school, and finish their college, and be somebody that they're supposed to be. Because [David] like basketball a lot, and he always practice it, and now he's have a team, and doing well in school, and then practice — you know, playing the basketball, I'd like him to — I'd like both of them to be in their feet as somebody — you know, everybody supposed to be.

Asked what she wanted her relationship with the boys to be, she said, "I'd like them to be my children. I like them to be my family." Ms. K explained she was "raising them like I raised my kids." She testified that she had defendant to her home and included him in Thanksgiving dinner with her family but "changed her mind" after the incident of him appearing drunk and demanding to see the boys at 6:00 a.m. on a Sunday morning. Asked whether she understood that defendant was mentally ill, she replied that she felt "like something wrong with him, because he came back again the next day, Monday evening with somebody. That time he's not drunk, but still on the same case. So, I think something wrong with him."

Ms. K testified that she took the boys to see their grandmother in a nursing home every few weeks and would be willing to have the boys see their

father also, just not in her home. Asked by the judge whether she would let the boys meet with their father at a restaurant or elsewhere, she testified she knew the boys wanted to see their father and would allow that.

Dr. Frank Dyer, a New Jersey licensed psychologist, conducted psychological evaluations in January 2018 of defendant and David and Samuel as well as the bonding evaluations relied on by the Division, and his testimony is central to the issues on appeal.

Dr. Dyer testified that defendant reported "his capability in terms of parenting these two children as being 100 percent adequate." Defendant assured the doctor "that the only reason that the boys have been in placement for so long a time is housing, that he has not been able to secure adequate housing, and that other than that — every other factor that might pertain to the safety, and health, and welfare of the children has been covered satisfactorily."

Dr. Dyer diagnosed defendant as suffering from schizotypal personality disorder with paranoid antisocial and borderline features. He opined that defendant "does not possess adequate parenting capacity, and that his prognosis for acquiring adequate parenting capacity within the foreseeable future was poor." Specifically, Dr. Dyer concluded defendant's

> personality problems and, again, the tangential, scattered, convoluted thinking processes, the

19

emotional volatility, the irresponsibility, the dismissiveness regarding the expectations of others in terms of standards of care, rules, laws and so forth, and the — the general wariness — suspiciousness regarding the motives of others, which would interfere with [defendant's] accepting direction by child welfare professionals who are attempting to work with him, all of those indicate that [defendant] is a very high risk for a disruption of another reunification.

Regarding his evaluation of both boys, Dr. Dyer noted the number of different placements the thirteen-year-olds had already endured, their "placement with [defendant's] girlfriend, removal from that placement, transferring to the grandmother, removal from the grandmother, reunification with [defendant]," then having that fail and finally placement with Ms. K. When Dr. Dyer conducted his assessments, the boys had already been in Ms. K's care for almost three years.

As to David, Dr. Dyer reported that the boy told him "first and foremost, he wants to be a professional athlete," which the doctor concluded was not fanciful, as David may have a chance at a career in professional sports. David told Dr. Dyer that he likes visiting his father, but is very satisfied with his current placement with Ms. K. He said Ms. K treats him well and meets all of his needs. Dr. Dyer testified that judging from David's words and tone that he "has a very positive emotional connection" to Ms. K.

David reported that if it were possible "for his father to take him back then that's where he would like to go, because he wants to be with family." Dr. Dyer believed that David's early loss of his mother "played into that very strongly because he's lost one parent and does not want to lose another." David, however, was also very clear that if it were not possible for him to return to his father, then "his preference would absolutely be to remain permanently with his resource parent." Dr. Dyer reported that David "expressed trust and confidence in Ms. K's promise to him that she would continue contact between [David] and his father."

Dr. Dyer opined, based on testing he conducted, that David, while of normal intelligence, has a previously unreported learning disability, affecting his reading. He also believed the boy suffered some residual effects of witnessing a domestic violence incident between his father and his father's girlfriend. Dr. Dyer found David an open and gregarious person, not at all suspicious or wary. He noted, however, that David has a sense of powerlessness and lack of control over his circumstances, that is not uncommon "in children who have been moved around and who have suffered a number of disruptions in the continuity of their care."

21

Dr. Dyer concluded that David does not suffer from any pathology. Instead, his "problems seem to be more related to situational factors" that could be overcome. Dr. Dyer offered the opinion that "[t]he greatest intervention for countering these adverse situational factors, in [his] view, is permanency, stability in the . . . the family environment where he has realistic expectations. He's confident that the caretaker is going to provide for him and so forth."

Dr. Dyer found Samuel "the much more problematic member of the family." Samuel told Dr. Dyer about his many placements, describing each one. He spoke warmly of his father, recounting the times he had rubbed his back during an asthma attack and would confront anyone smoking around Samuel and warn them to stop because of the boy's asthma.[4] Samuel was very impressed by that.

Samuel also spoke fondly of Ms. K, telling Dr. Dyer "about some of the things that he was able to persuade [her] to allow him to do like sleeping over

---

[4] Samuel suffers from severe asthma. One of defendant's substantiations for abuse and neglect arose out of his failure to provide the school, after several requests, with a nebulizer or medications to be administered to the boy in the event of an asthma attack. After Samuel suffered from an attack at school, he had to be taken by ambulance to the hospital. In the course of its investigation, the Division learned the boys didn't have a pediatrician, despite Samuel's chronic asthma condition.

at a friend's house."  Samuel also told him about other privileges he'd earned, including his own cell phone, and a tablet.  He was excited about getting a laptop computer "pretty soon."  Regarding the boy's wishes for his future, Dr. Dyer reported that Samuel told him

> in no uncertain terms, that he's already lost one parent, and he wants to be with his other parent.  If he can't be with his other parent, then he wants to be with a family member, because his connection to his family is something that is extremely important to him after suffering the tragic loss of his mother when he was a year old.

Based on his testing, Dr. Dyer concluded that Samuel was a "good artist," with fine hand/motor coordination, and that he does not suffer from the reading problem David does.  Dr. Dyer testified that his psychological testing of Samuel "conveyed two seemingly opposite psychological characteristics"; the first being "a great deal of anger and aggression," reflected in the school reports of fighting and Ms. K's early assessment of his behavior in her home, and the second "a real emotional neediness," reflected in the testimony of Cusumano and Maytidu.  Dr. Dyer explained his overall impression of Samuel was that he was

> in need of therapy to strengthen his capacity for impulse control, specifically control over his aggressive impulses, and also to help him to process some of his experiences, primarily the loss of his

mother, but additionally the number of disruptions in the continuity of his care that he has experienced along with his brother.

Turning to the bonding evaluations, Dr. Dyer explained that "the nature and purpose of bonding assessments vary according to the age of the child." When a child is young, the evaluator is focused on "the attachment profile" of the child, because in a child generally younger than six, "attachment is a critical determinant of how the personality is going to be structured in the future." Dr. Dyer explained that at that age, "disruptions in the continuity of a child's care, difficult attachments, unstable attachments, and other types of ways in which the attachment can go awry have profound effects" on a young child.

When dealing with thirteen-year-olds, like Samuel and David, "the focus changes because the child's personality is relatively structured." Dr. Dyer explained that what an evaluator is assessing with an older child are "more conventional issues" of whether the child feels secure and the present placement is meeting his needs. The evaluator is also interested in whether the child is able to respond behaviorally to the caretaker. The evaluator needs to understand the child's conscious attitudes toward the parent, and gauge the strength of the child's attachment to the parent in order to determine "whether

24

a complete separation from the parent is going to cause the child to experience some psychological harm."

Dr. Dyer reported that during his evaluation of defendant and his sons, defendant was preoccupied with giving them "moralistic lectures" that the boys were "somewhat responsive to." Defendant talked of going to dental school and learning to make the sort of gold dental grills popular with rappers for which he could charge $50,000 apiece. Dr. Dyer concluded the boys were accustomed to these sorts of flights by their father and didn't view them as genuine plans. Dr. Dyer found the boys enjoyed the contact with their father, with David being "much more enthusiastic and comfortable" than Samuel.

When the judge noted that the doctor's testimony seemed somewhat contradictory vis-a-vis Samuel and asked that he expound on his thoughts, Dr. Dyer explained:

> What I was attempting to convey, Your Honor, was that [Samuel] was very protective of his father during his interview. He did not want to say anything negative about his father. He highlighted his father's protecting him in terms of the asthma . . . , and rubbing his back, and abruptly confronting individuals who were smoking around [him]. So, he's trying to point out all of the good things that his father was doing for him. At the same time, now we have this incident where [Samuel] presented in the nurse's office wheezing with a severe asthma attack and there was no paperwork on file, and nobody could reach

25

[defendant]. And, so, [Samuel] had to go to the hospital for treatment. So, [Samuel] has had a lot of experiences of his father letting him down, but in terms of telling anyone outside the family that he was not satisfied with his father, that — that doesn't happen. He's very protective of his father, Your Honor.

Regarding his evaluation of Ms. K with the boys. Dr. Dyer reported "the children were very responsive, emotionally, to Ms. K." Ms. K discussed things with Samuel and David, and they shared their experiences with her. The boys taught Ms. K how to play a popular game she wasn't familiar with, which they all enjoyed. They talked about Ms. K's children and grandson, Eric, and Samuel addressed Ms. K "as mom, which is consistent with some of [Dr. Dyer's] observations about how he structured psychologically." Dr. Dyer testified both boys appeared to have a very good time interacting with Ms. K; they were well-behaved and responsive to her and she was "entirely appropriate with them," affectionate and attentive.

Dr. Dyer testified that Samuel and David get along well, and that it is important that they remain together. Dr. Dyer emphasized that the boys "have been each other's constant companion through their entire odyssey of placements, and they have come to rely on each other for support." While noting they "have the usual sibling rivalry experiences, of course," Dr. Dyer

26

found "they have a great deal of affection toward each other . . . reinforced by the fact that they have been through so many adverse experiences together."

Asked for his recommendation as to permanency, Dr. Dyer opined in light of both boys "very good adjustment" to their resource parent and her commitment to them, the "deficits" in defendant's parenting capacity and the "poor prognosis" for defendant achieving even minimal capacity in the reasonably foreseeable future, that the boys be adopted by Ms. K.

Asked whether he believed either David or Samuel would be harmed by the termination of defendant's parental rights, Dr. Dyer opined that termination would "basically [be] a net gain for [David] in terms of stability." While opining that David might "suffer some frustration that he would no longer have regularly scheduled visits with his father that were enforceable by the court," and that all contact would be in Ms. K's control, he did not perceive it to be a serious problem in light of David's confidence that she would ensure a continued relationship between him and his father.

As to the potential of harm to Samuel from the termination of defendant's parental rights, Dr. Dyer said "[t]hat would depend on whether there was continuing contact [with his father] or not." Dr. Dyer opined that if defendant's "parental rights were terminated and it was made clear to [Samuel]

27

that he was going to be with his resource mother permanently, then that would enable him to move on" and "more fully accept what the resource mother has to offer in terms of nurturance, structure, stability, guidance, positive role modeling and so forth, and this is if [Samuel] understood that there was no threat to his continuing contact with his birth father."

Dr. Dyer testified that "[i]f, on the other hand," Ms. K were to decide that contact with defendant was not in the children's best interests, "then I think that [Samuel] would have a problem." Dr. Dyer believed in that circumstance, Samuel "would be preoccupied with this theme of having lost his entire family now, and that would exacerbate his behavior problems."

Asked for his opinion of the likelihood of Ms. K cutting off the boys' contact with their father, Dr Dyer testified that based on his interview with her, his observation of her with the boys, and the case history, he believed there would be "a low likelihood," that Ms. K would put a halt to the visitation, so long as defendant "continues to conduct himself in an appropriate manner and does not appear under the influence of drugs, or under the influence of alcohol, [and] does not say wildly inappropriate things to the kids." Dr. Dyer explained that Ms. K "understands what [defendant] means to these children. She understands the importance of their having a continuing relationship with him.

A-1314-18T3

And, so, absent some egregious threat to their safety I feel certain that Ms. K would continue to allow contact."

Asked why he considered permanency so important to children, Dr. Dyer responded:

> Permanency is important because there is empirical evidence that says, very convincingly, that on a broad range of life adjustment criteria, including school, success, occupational success, avoidance of contact with law enforcement, having good mental health, avoidance of drug and alcohol problems, and just about anything else that one can imagine in terms of positive life adjustment, the children who have permanency fare much better than children who are continued in the limbo status of resource care, and I have a reference for that. It's Brodzinski and Brodzinski, Drs. David and Ann Brodzinski. The title of the work is "Children's Adjustment to Adoption," and I think it was published sometime in the early '90's. That is a literature review of all the studies available at that time, that show, very powerfully, that permanency is enormously helpful to children as opposed to keeping them in the uncertain status of foster care.

Asked whether adoption is still the best plan, given the boys were then fourteen, Dr. Dyer replied:

> Adoption is still the best plan because they would continue to have a stable, nurturing environment that meets their needs, and contact with a caretaker who is unequivocally committed to their welfare without any legal impediment to that situation continuing as would

29

be the case with continuing foster care or even with kinship legal guardianship.

Dr. Dyer was asked by the Law Guardian for Samuel if the doctor had considered kinship legal guardianship. He replied it "would have the disadvantage of granting a legally enforceable right of visitation to defendant." The judge broke in: "Oh, really? Is that — is that what your understanding of what the law is?" That led to the following exchange:

> DR. DYER: That's my understanding —
>
> THE COURT: What do you think the law is that somebody has to show to get visitation or parenting time or — or custody? What do you think the law is?
>
> DR. DYER: It's my understanding that a kinship legal guardianship agreement is worked out, it specifies visitation in the form of visitation, or telephone contact, and that that is binding, and can only be modified by going into court.
>
> THE COURT: [To the Law Guardian for Samuel] Are you happy you asked that question? That's a totally wrong answer. Totally misinformation about what — what kinship legal guardianship is. It can be an agreement like that, but that's not the law.
>
> THE LAW GUARDIAN FOR SAMUEL: Um-hum. Your Honor — I mean, not Your Honor — Doctor, would your opinion about adoption versus kinship legal guardianship be any different if you were told that a kinship legal guardianship visitation arrangement would be ordered by the Court, it's not necessarily something that's developed by the parties,

so the Court can be informed by that, but at the end of the day it's the Court that decides what the visitation would be?

THE COURT: All right. Hold on. I'm — I'm not going to allow that. Doctor, I'm going to explain to you the fundamental difference between adoption and kinship legal guardian status.

DR. DYER: Yes, Your Honor.

THE COURT: And I'd like your honest opinion about it, because that's what counsel for one of the children wants.[5] The fundamental difference is, if the child is adopted it's completely up to the control of the adopting parent as to whether or not the child has any contact with the father or mother.

DR. DYER: Yes, Your Honor.

THE COURT: Kinship legal guardian status does not guarantee that the biological parent will have any contact with the child. The biological parent must make an application to the Court and be able to prove to the judge, by clear and convincing evidence, that either he should have any parenting time at all, or possibly get custody back. That's the difference. Now, I'd be happy to hear your thoughts on that.

DR. DYER: Okay. My thoughts about that is that a relationship, such as the one that Your Honor first described in which the adoptive parent had complete control over what would happen with the adopted

---

[5] As we mentioned at the beginning of this opinion, the Law Guardians for both boys advocated at trial for termination of defendant's parental rights and their adoption by Ms. K.

child is preferable in this case to anything that would be less than that.

. . . .

LAW GUARDIAN FOR SAMUEL:  Okay.  And what would be the reason for that?

DR. DYER:  The reason for that is, as I responded to your earlier question [defendant] has demonstrated a well-developed capacity to display emotional volatility during visits, to behave in a menacing and hostile manner toward the children, to upset the children by yelling and cursing at visitation supervisors, making comments such as "I've been praying for death ever since you guys were born." That's as recently as May of this year, and also as recently as May of this year, making the statement about — or alluding to [David's] school being reduced to ashes, which is a veiled threat.[6]  So, given those particulars I would say that the most satisfactory course for protecting these children would be to place the complete control over what happens to them in the hands of the adoptive parent.

LAW GUARDIAN FOR SAMUEL:  Do you think that [Samuel] is psychologically amenable to being adopted?

DR. DYER:  As I testified on direct, I would say that if [Samuel] did have some ongoing contact with [defendant] then that would greatly ease his situation. It would enable him to move on if he were adopted and he knew that the — the resource parent would

---

[6]  Maytidu testified that defendant threatened to "reduce the school to ashes" when David wanted to cut short his weekly visit with his father to attend a basketball game at school.

provide him with opportunities to see his father, providing his father behaved appropriately and substance free. If [Samuel] experienced a total loss of contact with his father, then I think that that would have a harmful effect on him, because it would call up all of these concerns that he has about being totally disconnected from his family, which is very painful for him.

LAW GUARDIAN FOR SAMUEL: And you have confidence in this caregiver in providing ongoing contact if she had the opportunity to adopt? Because, as we know in New Jersey, . . . there's no such thing as an open adoption in New Jersey. You can't — you can't force a caregiver — an adoptive parent to continue visits beyond adoption.

DR. DYER: No, I understand that, and as I stated on direct, I have complete confidence in this particular resource parent to make good on her promise of continuing contact between the children and [defendant] providing that [defendant] did not — did not pose any sort of threat to the children by irrational behavior, menacing behavior or appearing under the influence of some kind of substance or alcohol.

The Law Guardian for David returned to the subject of permanency in her cross-examination of Dr. Dyer, asking him to expand on the benefits to "permanency of an adoption" for David and Samuel "at this point." Before the doctor could answer, the judge broke in again, saying, "All right. I'm going to need to square away that question because you mixed adoption and permanence." The Law Guardian rephrased her question, saying:

"Considering that the goal is adoption, and that the goal of adoption is permanency, can you elaborate on how else permanency and the goal of adoption would benefit" Samuel and David.

Dr. Dyer replied by explaining his view that "[p]ermanency would also afford these two boys continuing opportunities that are present in the home of this resource parent that are really unusually good, and would not be present in many other placements." He concluded his response by stating:

> Anything short of adoption, I would say, runs the risk of, at some point, derailing the process or negatively influencing it, because of some legally enforceable visitation or other form of contact, or other modification that [defendant] may persuade some judge in the future would be appropriate for — either or both boys. So, my — my preference would be to continue them with absolute control of their environment, and of their welfare placed in the hands of this — this caretaker whom I view as a mature, affectionate and appropriate person who is totally committed to the welfare of both children.

Asked by the law guardian for Samuel to explain the view he expressed about the importance of adolescents having a permanent and stable home, Dr. Dyer replied:

> Because adolescents are more heavily involved in peer relationships than are younger children. Peer contact and being like one's peers, and having the same advantages as one's peers, all of that plays a part in the adolescent's sense of self and in their adjustment. For

34

an adolescent to be moving around from place to place, living in temporary quarters one month and then moving somewhere else another month, and then having a disruption, all of that would severely interfere with the very thing that is most important to adolescents in terms of getting along with other people socially, and that is fitting in with their peers.

Permanency with the current caretaker would guarantee that to the extent that it is possible for her, through her directed efforts, that this caretaker would structure the boys' environments to promote positive connections with their peers, and would provide them with whatever they needed in terms of stable home, clothing, transportation, tutoring, whatever else they needed to allow them to fit in, and I would like to add that in this particular case, with two adolescent boys, who have been through such chaotic conditions in the past, the tragic loss of their mother when they were a year old, repeated disruptions in the continuity of their care, witnessing domestic violence when they were with their father, that fitting in and feeling normal, feeling like they fit in is a very important part of their healing process.

On continued cross-examination of Dr. Dyer, defendant's counsel asked him "what would be the risk of harm to the boys if they resided [in] the foster home under a plan of KLG?" The deputy representing the Division objected on the basis that KLG was "not the plan," as Ms. K had rejected KLG and wished to adopt the boys. The judge overruled the objection, stating:

It's certainly not the plan, but it's certainly an issue, and I will ask counsel to brief me, because I think there's case law that tells me — that, in going through

35

the four prong test, the fact that there might be an alternative . . . of KLG should not be considered by the Court. I think it's a little ambiguous, because still in Prong IV, I still have to find more harm than good would come out of the failure to terminate. So, I don't think there's any secret what our issues are. So, I'm going to allow the question.

Dr. Dyer responded by stating:

Okay. Here's my concern. Either this court or perhaps some future court, [if] there's a plan of KLG may be convinced by [defendant] that a legally enforceable visitation schedule would be an appropriate thing for the boys. Now, at the present time, it's my understanding [defendant] is not receiving any services. He's not receiving any drug or alcohol monitoring, no therapy, and in May of this year he said the egregiously inappropriate things that I just went over in my testimony, telling the children he was — praying for death since they were born, and alluding to [David's] school going into ashes. So, my concern is that if he had legally enforceable visitation that there might be a regression to these kinds of behaviors and, in fact, I would — I would go further than — than saying, there might be a regression. I perceive a likelihood of there being a regression to these kinds of behaviors because the record abounds with such instances during visitation. And that would have a negative effect on the boys. Also, it is not beyond [defendant's] capacity, in my view, to refrain from doing things to try to undermine the parental authority of the kinship legal guardian, which would also be very confusing for the boys and injurious to them. So, those are the kinds of concerns that I have. Anything less than adoption would permit these scenarios that I just went through.

After hearing two days of testimony, the judge put an oral opinion on the record. The judge had no hesitation in finding the Division established the first prong of the best interests standard, that the children's "safety, health or development has been or will continue to be endangered by the parental relationship," N.J.S.A. 30:4C-15.1(a)(1), by clear and convincing evidence.

Relying on the expert testimony of Dr. Sostre and Dr. Dyer, the judge found "[t]he evidence is overwhelming that [defendant] has had a significant, longstanding mental health issue or issues." He noted defendant's recent hospitalization requiring an adjournment of the trial "triggered by [defendant] making a serious implied threat regarding, 'going postal,' in his discussion with the therapeutic visitation coordinator." He credited the testimony of Cusumano, which he found "objective, and wholly credible," as to defendant's inability to engage in treatment for any length of time, and of Maytidu, whose testimony he likewise found "credible, helpful and insightful," as to the effect defendant's often angry and aggressive verbal assaults had on the children's emotional and psychological wellbeing.

In making his findings on the first prong, the judge also relied on Dr. Dyer's opinion that defendant had a personality disorder, manifesting itself in his extreme suspicion of others and "convoluted thinking," and that he misused

37

alcohol and marijuana. The judge found Dr. Dyer's testimony regarding his evaluations and his opinion that defendant could not safely parent his children "credible and helpful to the court" in its evaluation of defendant's mental health. The judge concluded the uncontroverted evidence "certainly demonstrates that the children's safety, health or development will continue to be endangered by the parental relationship insofar as it means that the children would live or be parented solely by [defendant]." The judge found "[t]he evidence is clear and convincing that he will not, in any foreseeable future, be able to have physical custody of his two sons."

Although our Supreme Court has noted that the first and second prongs "are related to one another, and evidence that supports one informs and may support the other," In re Guardianship of DMH, 161 N.J. 365, 379 (1999), the trial judge determined "to skip over" analysis of the second prong and proceed to analyze the proofs on the third prong, that is whether the "[t]he Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights," N.J.S.A. 30:4C-15.1(a)(3).

As to the third prong, the judge deemed the evidence "overwhelming" that the Division had "made more than reasonable efforts to provide services to help [defendant] correct the circumstances which led to the children's placement outside of his home." The judge again relied on the testimony of Leonard Cusumano,[7] whom he found "demonstrated extreme dedication to the mission of the Division," who "very credibly documented over a course of many years efforts to provide for and engage [defendant] in services" to no real avail. As to alternatives to termination, the judge concluded that because N.J. Div. of Youth and Family Servs. v. R.G., 217 N.J. 527, 558 (2014), made clear he could not consider KLG "as an alternative," here, he found the Division had "met its burden of proof by clear and convincing evidence" on the first and third prongs.

The judge next turned to consider the second and fourth prongs. As to the second prong, whether "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the

_____

[7] The judge said "[i]t would be difficult to imagine a division worker who more thoroughly understood and implemented the legal mandates that the Division is required to adhere to in these matters of abuse or neglect to children" than Mr. Cusumano. Having reviewed the record, we agree with the judge's assessment.

harm," N.J.S.A. 30:4C-15.1(a)(2), the judge found "[t]he evidence is overwhelming that [defendant] has been unable to eliminate the harm facing the children, and is unable to provide a safe and stable home" for them. Based on "the length of time that [defendant] has been unable to engage consistently in mental health treatment," the judge found, by clear and convincing evidence, that it was "extremely unlikely that [defendant] will ever be able to successfully and safely parent his children."

The judge also found, however, that "there is a second aspect of Prong 2 that must be met. That is the delay of permanent placement will add to the harm." Because the court's findings on this point are critical to the issues on appeal, we quote them at length.

> Now, it is clear from the evidence that these two children are happy to be in the home that they have had with Ms. K. Not only are they happy, but the testimony is that they are doing much better with the stable and loving life that they have had with her since 2015. Ms. K is one of those . . . extraordinary and wonderful humans that takes children in from the Division without knowing how it's going to turn out. It is hard to imagine a teenage placement that could have worked out better for these two teenage boys. I certainly find that under no circumstances should these children be removed from Ms. K's home. This is proven by clear and convincing evidence.
>
> Will the delay of a designation of a permanent placement add to the harm of these two children who

are teenagers? These children should know they are not going anywhere other than where they are right now. In that sense, it is clearly and convincingly demonstrated that the division has proven Prong 2. However, given that they are not going to be moved under the authority of this Court, and it is proven by clear and convincing evidence that the father will not be able to reunify with his children, there is a question in the court's mind regarding these teenagers, just three and a half years away from 18 years — 18 year old adulthood are in need of a permanent designation at this moment given the bond that they have with their father. This analysis flows over to the considerations of the fourth prong of the statute.

Thus, the judge proceeded to resolve the question presented by the fourth prong, whether "[t]ermination of parental rights will not do more harm than good," N.J.S.A. 30:4C-15.1(a)(4), by considering whether the boys "are in need of a permanent designation," at fourteen-and-a-half, "given the bond they have with their father."

Although recognizing that the facts in R.G. were not analogous to those in the case before the court — that case involving a father incarcerated when his daughter was six months old, to whom the Division had not offered services during his five-year prison term, who was defending against the Division's efforts to terminate his parental rights as he was re-entering society — the judge nevertheless looked to that case for guidance here. He found two points particularly instructive. First, the judge noted the Supreme Court's

admonition there that "[t]erminations should be granted sparingly and with great caution because they irretrievably impair imperative constitutionally-protected liberty interests and scores of centuries of societal family constructs." R.G., 217 N.J. at 553. The judge noted that "as it happens, family constructs in our nation, as part of its history, were deliberately and systematically destroyed for a certain segment of our population.[8] And, so, we must be very careful when we're interfering with family constructs. And I emphasize centuries of societal family constructs."

Notwithstanding his acknowledgment of the Court's emphatic statement in R.G. that "a child's need for permanency is an extremely important consideration" for the fourth prong, id. at 559, the judge chose to focus instead on a statement the Court made criticizing our finding on the second prong. We had concluded that the defendant's approval of his daughter's placement with her grandmother while he was in prison, and his unwillingness to immediately seek custody of her on his release, established he was unable to abate the harm his incarceration had caused his daughter. Id. at 560-61. The Court found "that interpretation suggests that a parent, by virtue of his unwillingness to

---

[8] We assume the judge was referring to our country's mistreatment of blacks and historical efforts to undermine and destabilize black families. Defendant and his sons are black, as is their resource parent.

seek full custody of his child, relinquishes the other parental rights protected by both the United States and New Jersey Constitutions." Id. at 561. The Court rejected that notion as inconsistent with common experience. Adverting to the "visitation rights . . . almost invariably granted to the non-custodial parent in a divorce," the Court observed it was "not uncommon . . . for a parent to relinquish custody of his or her children but maintain other parental rights." Ibid. (quoting V.C. v. M.J.B., 163 N.J. 200, 228 (2000)).

The trial judge interpreted the Court's remark to mean that "the inability of a parent to actually take a child into his or her custody is not the dispositive issue for Prong 4." The trial judge concluded the "[c]ritical facts were that the child in R.G. displayed an affection for[,] an[d] emotional bond with her father," and "the father['s] testimony that immediately preceding the hearing, [the defendant's daughter] told [the defendant] that she loved him, and looked forward to spending time with him in the future." With that guide, the judge proceeded to evaluate whether termination of defendant's parental rights would do more harm than good by considering the bond David and Samuel have with their father.

Turning to Dr. Dyer's testimony, the only expert to testify about defendant's relationship with his sons in the case, the judge again noted his

acceptance of the expert's opinion that defendant "would not have the capacity to safely parent his children by having custody of them." The judge also credited the expert's assessment of both boys and his opinions as to the connection they had with their father and the one they had developed with Ms. K in the more than three years she'd cared for them. The judge, however, rejected Dr. Dyer's opinion that termination of defendant's parental rights and adoption by Ms. K would be in the children's best interests, deeming it neither persuasive nor credible. Indeed, the judge deemed Dr. Dyer's testimony that termination would not do more harm than good, a "net opinion." Although stating that "many of [Dr. Dyer's] observations were credible," the judge found the psychologist's "bottom line opinions with respect to the absolute need to proceed to adoption do not seem to fit the facts to which he . . . testified," specifically, the existence of the bond "the boys have with their father."

The judge was particularly troubled that "Dr. Dyer did not seem to understand the fundamental difference between kinship legal guardian status and adoption," although stating he was "not making part of my ruling that the alternative kinship legal guardianship to be put into place." The judge noted in that regard that "[w]hatever happens after [his] decision" to dismiss the guardianship complaint "is undetermined."

The judge noted that Dr. Dyer was the Division's expert in <u>N.J. Div. of Youth & Family Servs. v. E.P.</u>, 196 N.J. 88, 98 (2008), in which the Supreme Court reversed both the trial court's and this court's finding that termination was warranted under the fourth prong in the case of a twelve-year-old who had cycled through seven foster homes with no real prospect of "permanent placement with an adoptive family" and whose "only enduring emotional and loving bond" was with her mother. The judge concluded Dr. Dyer is "very adoption biased as indicated in the <u>E.P.</u> case and is willing to put aside other factors that I believe are present in this case."

Discussing those factors, the judge noted the testimony of both the adoption worker, Cusumano, and the mental health clinician, who oversaw defendant's therapeutic visitation, Maytidu, that defendant rarely missed a visit with his sons. And although defendant was "sometimes inappropriate," the judge noted, "[o]f course, he's a severely mentally ill person, whose not getting treatment."

The judge also took into account what he characterized as the boys' "ambivalence and uncertainty" about adoption. He found their reaction "understandable. They are teenagers. They are in a loving home, yet they love their father." The judge likewise reflected that defendant grasped that he could

not provide a home for his sons but believed "breaking the family bond should not happen." While agreeing with Dr. Dyer's assessment that defendant would likely never have the capacity to safely parent his children, the judge found "given the age of the children, and the relationship with their dad, reunification and adoption are not the only things that can happen."

Considering those factors, the judge concluded "the children have a caring relationship with their significantly mentally ill father. They appear to care about him, and he cares about them." In light of that relationship, the judge deemed himself "not persuaded" that the Division had clearly and convincingly established that termination of defendant's parental rights would not do more harm than good. The court declared that

> These two boys are not going anywhere, other than where they are now for as long — for the long and foreseeable future. They are doing very well where they are, under the care of a perfect, and I emphasize from my point of view, perfect resource parent, who would be happy to adopt them. She will never abandon them regardless of the court's decision.
>
> She testified she wants to care for these children forever onward. That relationship should definitely continue in the best interests of the children. At the same time, completely severing the legal relationship between [defendant] and his two children carries with it significant danger and harm.

46

A fair argument is made that termination will not do more harm than good.  I am not convinced of that based upon the credibility of the witnesses and the overall best interests of these two children. They are just under 14 and a half years old.  They lost their mother very early in their lives.  They continue to have a significant connection with their father.  They know he will not be able to take them into any home, or provide for them.  Not too many years from now, at the age of 18, these two boys will be able to declare, on their own, whether they want to be legally, fully, and completely adopted by Ms. K.  The evidence demonstrates that they will remain in that home almost assuredly until they reach the age of 18.  Ms. K certainly welcomes that up to 18 and beyond, according to her testimony, and I believe her.  She wants those two boys to go to college.

Declaring that he saw "potential harm coming to these twin boys if their father's rights are fully and finally terminated" by "cut[ing] a cord that the children have had with their biological family," the judge dismissed the guardianship complaint.  This appeal followed.

Our standard of review is well established.  We ordinarily accord deference to the Family Part based on its special jurisdiction and expertise.  Cesare v. Cesare, 154 N.J. 394, 411-13 (1998).  We defer to the court's factual findings if supported by adequate, substantial and credible evidence in the record.  R.G., 217 N.J. at 552.  The scope of our review, however, is expanded "where the focus of the dispute is . . . alleged error in the trial judge's

evaluation of the underlying facts and the implications to be drawn therefrom." Ibid. (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). Our review of questions of law is, of course, de novo. Nicholas v. Mynster, 213 N.J. 463, 478 (2013); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Although we are mindful that a decision that the Division did not prove its case is entitled to enhanced deference because the Division is always free to file a new action seeking to terminate the parents' rights, R.G., 217 N.J. at 553-54, the analytical errors here, including the trial court's conclusion that long-term placement with a resource family remains an appropriate alternative to termination, notwithstanding twenty years of explicit case law to the contrary, see In re Guardianship of K.H.O., 161 N.J. 337, 360 (1999), and the intolerably long delay in providing Samuel and David the permanency they are entitled to under our law, compel vacating the decision and remanding for further expedited proceedings.

We begin our analysis with a fundamental principle the trial court appears to have lost sight of: "[p]arental rights, though fundamentally important, are not absolute." Id. at 347. A parent's constitutional right to raise his or her child is tempered by the State's parens patriae obligation to protect

that child's welfare.  Ibid.  How a court balances those two conflicting ideas is by faithfully applying the statutory best interests of the child standard to the evidence presented at a guardianship trial.  Ibid.  Termination of a parent's rights to his or her child may be ordered only upon the State's clear and convincing proof of each of the following four prongs of the best interests standard:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The four prongs of the best interests standard "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018) (quoting K.H.O., 161 N.J. at 348). As the Supreme Court has often reiterated, "[t]he considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." K.H.O., 161 N.J. at 348.

The trial court's analytic errors in this case flowed, in part, from the judge looking for guidance in this 'extremely fact sensitive' decision of whether to terminate defendant's parental rights to a case, R.G., which is wholly dissimilar from the one before us. As we mentioned above, the defendant in R.G. was sent to prison for five years when his daughter was six months old. 217 N.J. at 536. While he was incarcerated, the child's mother's abuse of alcohol rendered her unable to care for their daughter. Ibid. The defendant consented to the child's placement with her maternal grandmother. Id. at 536-37. The Division's efforts at reunifying the child with her mother were unsuccessful, and the defendant being unavailable to assume her care, the

Division filed a guardianship action to terminate the rights of both parents to be followed by the child's adoption by her grandmother.  Id. at 537.

The case came to trial just as the defendant was leaving prison.  Id. at 539.  The defendant acknowledged his situation made it impossible for him to assume custody of his daughter immediately but opposed termination because he wanted "contact and visitation with [his daughter] in order to foster and enhance their present relationship."  Id. at 538.

In R.G., the Division claimed the defendant's incarceration resulted in the abandonment of his daughter.  Id. at 536-37.  The Division did not provide the defendant with services, and he had no personal contact with his daughter while in prison as he did not want her visiting him there given her young age.  Ibid.  The defendant's psychological evaluation revealed no pathology, and the defendant's crimes were not of the nature that might suggest concern for parenting.  Id. at 536, 539.  There was no bonding evaluation conducted of him and his daughter, as the years he spent away from her in prison would have made the presence of any bond unlikely.  Id. at 540.

In short, R.G. is completely dissimilar from this matter, and the trial court's effort to force an analogy based on defendant's inability to assume

physical custody of his sons, for very different reasons than the defendant in R.G. could not assume custody of his daughter, led the court into error.

Specifically, the trial court looked to R.G. in assessing the second prong, whether "the parent is unwilling or unable to eliminate the harm or . . . provide a safe and stable home for the child and the delay of permanent placement will add to the harm," N.J.S.A. 30:4C-15.1(a)(2).  Although finding "it extremely unlikely that [defendant] will ever be able to successfully and safely parent his children," the judge found "there is a second aspect of prong 2 that must be met," that "the delay of permanent placement will add to the harm."  That was clear error here.

As the Court explained in K.H.O., the second prong of the best interests statutory standard "relates to parental unfitness," which the Division can establish in more than one way.  161 N.J. at 352.  The Division can "demonstrate[] that the parent is 'unwilling or unable to eliminate the harm' that has endangered the child's health and development," N.J.S.A. 30:4C-15.1(a)(2), or, alternatively, that "the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child."  K.H.O., 161 N.J. at 352.  The Division need prove only one

of those alternatives, not both, to establish the second prong of the statutory standard.

The first and second prongs are inextricably intertwined. The test of the second prong "is aimed at determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child." Id. at 348. In order to make that determination, of course, one has to be clear about the harm the parent has to cure and overcome. Id. at 350-53 (explaining in the case of an infant born addicted to drugs, the proofs on the second prong "may be met by indications of parental dereliction and irresponsibility," including the parent's continued or recurrent drug abuse, inability to provide a stable home, the withholding of parental attention, and the diversion of family resources to support a drug habit, resulting in neglect and lack of nurture).

Here, there is no dispute that the judge found the Division had carried its burden of establishing the first prong, that the boys' "safety, health or development has been or will continue to be endangered by the parental

relationship," as a result of defendant's "significant, longstanding mental health issue or issues."[9]

Although also finding "[t]he evidence is clear and convincing that [defendant] will not, in any foreseeable future, be able to have physical custody of his two sons," because of those longstanding mental health issues, the judge did not recognize that finding conclusively established the second prong. Instead, as we previously noted, the judge erroneously found — likely because of his having latched onto R.G. as the case having the most to offer here to guide his analysis — that the Division needed to also prove that delaying permanent placement of David and Samuel will add to the harm.

But the Division in R.G. moved to terminate the defendant's parental rights based on his inability to provide a safe and stable home for his daughter because of his incarceration, not because he lacked capacity to care for his child, as defendant here. R.G., 217 N.J. at 542 (noting "the trial court considered whether appellant's incarceration constituted abandonment . . . because abandonment was the only harm that the Division's complaint alleged against appellant"). Because the identified harm in R.G. was abandonment,

---

[9] Although the judge also found defendant had been unable to provide his children a safe and stable home, defendant's "severe mental illness" was obviously the driver in all his failings as a parent.

not incapacity, the second prong inquiry in R.G. necessitated the further consideration of whether a "delay in permanent placement" will further harm the child. K.H.O., 161 N.J. at 352. That inquiry is not relevant when the harm to the child follows from the parent's incapacity to safely parent due to severe mental illness the parent has never been willing to treat. See In re Guardianship of A.A.M., 268 N.J. Super. 533, 545 (App. Div. 1993); see also N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 436 (App. Div. 2001). Additional time will not cure the problem.

This second prong error infected the judge's analysis of the proofs under the fourth prong, whether termination will not do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). As the Supreme Court has instructed, when a child is in the care of a resource parent, the trial judge "must inquire into the child's relationship both with her biological parents and her foster parents." K.H.O., 161 N.J. at 355. "The question to be addressed under [the fourth] prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid.; see also Fall & Romanowski, N.J. Family Law, Child Custody, Protection & Support, § 13:5-5 (2020) ("Harm under the fourth prong is

relative, requiring the court to compare the potential harm resulting from an involuntary termination of parental rights, which has as its goal permanency and stability for the child, to the potential harm if parental rights are not terminated and the child is not afforded the opportunity for permanency and stability.").

Instead of undertaking that inquiry, as required under the statutory standard and the case law interpreting it, the judge considered whether the children, at fourteen-and-a-half, needed the permanency that adoption by Ms. K would provide them. Overlooking a legion of published cases stressing "New Jersey's strong public policy in favor of permanency," K.H.O. 161 N.J. at 357, and "the paramount need . . . children have for permanent and defined parent-child relationships," In re Guardianship of J.C., 129 N.J. 1, 26 (1992), the trial judge put the goal of permanency on one side of the scale and improperly "balanced" that against the children's biological tie to their father. Thus, instead of weighing whether terminating defendant's parental rights to his sons would do more harm to the boys than permitting their adoption by Ms. K, the trial judge decided the children's biological bond to their father outweighed their need for adoption and permanency, and he could continue them in the legal limbo of long term foster care until they turn eighteen and

can decide for themselves whether "they want to be legally, fully, and completely adopted by Ms. K."

That also was clear error. Our courts have no authority to eschew the Legislature's goal of providing children permanency, either with their natural parents or adoptive parents. With the repeal of The Long Term Foster Care Act, N.J.S.A. 30:4C-26.13, in 2004, L. 2004, c.130, §128, long-term placement is no longer an appropriate alternative permanency plan in this State. Fall & Romanowski, § 32:3-4. Even before the repeal of the Act, the Supreme Court instructed in K.H.O. that "[l]ong-term foster care is the exception to the general rule favoring adoption, . . . available under only very limited circumstances," and certainly not where, as here, in the trial judge's words, a "perfect resource parent" stood ready to adopt. K.H.O. 161 N.J. at 360-61 and n.8.

K.H.O. involved a mother "still capable of maintaining a limited benign relationship with her child," but unable, due to long term drug addiction, to "strengthen or extend that bond and function as a parent in providing for K.H.O.'s physical and emotional needs and assuring her normal development." Id. at 356. Applying the four prong statutory standard, the trial court terminated parental rights. Id. at 345-46. We reversed. In re Guardianship of

K.H.O. 308 N.J. Super. 432, 456-58 (App. Div. 1998). Because we were not convinced the record clearly and convincingly established that severing the child's bond with her biological parent would not harm her, and we doubted that the resource parents would "disappear" if denied the right to adopt the child, we reinstated the mother's parental rights but maintained the status quo by continuing custody in the Division and placement with the resource parents. Ibid. In the event the Division were to continue to pursue guardianship, we directed that "expert evidence should be provided that forms a basis for the trial judge to cogently consider the viability of long-term foster care with continuing biological family visitations as an appropriate alternative to termination and adoption on the one hand, and reunification on the other." Id. at 458.

In a landmark decision, regularly cited more than twenty years later, the Supreme Court reversed. K.H.O. 161 N.J. at 363. The Court held we "incorrectly treated long-term foster care on a par with the creation of permanent lasting ties with either the natural parents or the adoptive parents," which did "not accord with the best interests of the child" as reflected in State law and public policy. Id. at 360. The Court recognized that "[t]he risk to children stemming from the deprivation of the custody of their natural parent is

one that inheres in the termination of parental rights and is based on the paramount need the children have for permanent and defined parent-child relationships." Id. at 355 (quoting J.C., 129 N.J. at 26).

Given the Legislature's clear policy choice of "favoring reunification or adoption over long-term foster care," and acknowledging there "can be no genuine replacement or substitute for the deprivation of nurture by the natural parent," the Court in K.H.O. held "the fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties." Id. at 355, 360. Instead, "[t]he question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Id. at 355.

Neither trial courts nor appellate courts are free to duck the painful choices presented in those cases where a parent's inability "to transfer affection or care to their children may be attributed to the parents' being short-changed by either nature or society." Id. at 357 (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 615 (1986)). "As tragic as the consequences to the parents of the loss of their children may be," the courts of this State are not

free to "ignore evidence of serious injury. It is inappropriate to disregard a clear and essentially undisputed showing of such injury and its probable consequences because society may have been unfair to the parents." A.W., 103 N.J. at 614.

This record here contains that "essentially undisputed showing of such injury and its probable consequences" to Samuel and David. In addition to the analytic errors caused by trying to shoehorn the facts of this case into R.G., the trial court mistakenly avoided confronting the injury to these boys and its probable consequences through its evidentiary error of dismissing Dr. Dyer's testimony as a net opinion.

The net opinion rule, of course, "mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Townsend v. Pierre, 221 N.J. 36, 55 (2015) (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). In the usual shorthand, it requires an expert to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

Dr. Dyer's opinions in this matter, quoted extensively above, are obviously not excludable net opinions under N.J.R.E. 703. Dr. Dyer is a well-qualified expert whose opinions have been cited in a dozen published cases involving the termination of parental rights. He conducted psychological assessments of defendant and his sons as well as the only bonding evaluations in the case. He explained his methods and the purpose of each inquiry, noting the differences in a bonding evaluation of a caretaker and a young child from one involving an adolescent. The facts Dr. Dyer relied on in coming to his conclusions were the same ones the trial judge relied on in his opinion. Indeed, the judge accepted Dr. Dyer's opinion that defendant lacked the capacity to parent his sons either now or, likely ever, as well as his assessments of the boys and the connections they have, both to their father and Ms. K.

It wasn't the "why and wherefores" of Dr. Dyer's opinion that troubled the trial judge, it was Dr. Dyer's conclusion that termination of defendant's parental rights to David and Samuel and their adoption by Ms. K was in their best interests. But that conclusion was thoroughly explained on the record, including with reference to the professional literature supporting the doctor's view that children fare better by being adopted by a caring resource parent

than remaining in long term foster care, and why he believed these boys would fare better by being adopted by Ms. K, even given their ages, than remaining in her care in their indeterminate status. A trial judge presiding over a bench trial is, of course, free to reject the opinion of an expert. Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002). The judge is not free, however, to label it a net opinion as the means of excluding it so as to avoid confronting its content.

The judge's ostensible reason for rejecting Dr. Dyer's "bottom line opinions with respect to the absolute need to proceed to adoption," was because the judge found him "frankly . . . very adoption biased as indicated in the E.P. case." E.P. was decided over ten years ago, in 2008. It represents a particularly extreme example of the difficult choices facing courts and experts where a parent has exposed a child to continuing harm through abuse or neglect, has been unable to remediate the danger, making reunification unlikely, but there is no permanent placement with a loving family awaiting the child on the other side. E.P., 196 N.J. at 108. Dr. Dyer testified for the Division in that case, opining that a "failed reunification" with the child's drug-addicted mother was not in the emotionally fragile thirteen-year-old's best interests, that the child had a closing window of opportunity to become

attached to another caretaker, and that a permanent caretaker was especially important in that case because of the child's need for "a great deal of structure, supervision, therapeutic attention, . . . medication monitoring by a psychiatrist, and also special education geared towards her emotional and behavioral problems." Id. at 98.

The Supreme Court did not find Dr. Dyer's opinion "adoption biased," it simply disagreed with his view, as well as that of the trial court and this court, that termination was in the child's best interests in light of her emotional attachment to her mother and the remote chance of her adoption. Id. at 109. There are two things to note about the trial court's "bias" finding. First, the judge did not raise E.P. with Dr. Dyer, and none of the lawyers brought it up. Rejecting an expert's view as "biased" based on an opinion he offered in a different case a decade earlier, without even asking him about it, is plainly unsound and simply unfair to the witness and the party presenting him. For all anyone knows, the witness could have changed his mind on the issue in the ensuing decade. More to the point here, however, is that the "bias" in favor of permanency the trial judge criticized in Dr. Dyer's testimony is a bias incorporated in our law and public policy. See id. at 110-11 (noting "[the Supreme] Court, the State Legislature, and even the United States Congress,

have emphasized that permanency must be the Division's goal") (footnote omitted).

That brings us to the court's troubling comments about KLG in this case. Having reviewed the entire record, it is obvious that there was a veiled, and sometimes not so veiled, frustration among some of the participants in this trial with Ms. K's change of heart on KLG. While we can understand the frustration of a lawyer who cannot secure his client's desired outcome in a matter, defense counsel's statement on the record, which culminated in the comment that if the resource parent "doesn't want to do KLG anymore," then she should "return these children," and "[w]e'll find somebody who probably wants the best of both worlds" for them, obviously crossed the line. Counsel should have been immediately admonished by the trial judge that his comments were wholly inappropriate. The judge, instead, sympathized with the statements, saying, there was "a part of [him] that under[stood] precisely what [counsel] [was] saying." The judge then went on to say he found the difference between KLG and adoption "almost meaningless" at the boys' ages and concluded by confessing he didn't "get it."

Those comments by the judge, and his decision to permit defendant to question Dr. Dyer about the risk of harm to the boys under a KLG, overruling

the Division's objection that KLG was "not the plan," with the statement that "It's certainly not the plan, but it's certainly an issue," because the judge "still [had] to find more harm than good would come out of the failure to terminate," give his later exchange with Dr. Dyer about the difference between adoption and KLG, and the judge's reflection on it in the course of delivering his opinion from the bench, a more disturbing cast.

KLG was not an issue in this case, although it came up again and again. Unlike the trial judge, we do not find the doctor's explanation of why he believed KLG to be a less desirable option here than adoption, because it "would have the disadvantage of granting a legally enforceable right of visitation to defendant," a gross misunderstanding of the law. No less an authority than our Supreme Court has stated that in a KLG, "the parent remains entitled to visitation." R.G., 217 N.J. at 558 (quoting N.J. Div. of Youth & Family Servs. v. S.V., 362 N.J. Super. 76, 87 (App. Div. 2003)).

We find the remarks the judge made in the course of his ruling about his exchange with Dr. Dyer particularly troubling. In expressing surprise about Dr. Dyer not "seem[ing] to understand the fundamental difference between kinship legal guardian status and adoption," the judge said he was "not making part of my ruling that the alternative kinship legal guardianship be put into

place.  <u>Whatever happens after my decision is undetermined</u>" (emphasis supplied).

Ms. K, the resource parent here, is not related to defendant or his sons. She testified she was 71 years old at the time of trial and had never volunteered to serve as a resource parent before.  Samuel and David were the first children she'd ever fostered.  Although she has family nearby, she lives alone with the boys.  It is undisputed that she has provided them a safe and loving home, effecting a remarkable change in both their lives.  It is hard to imagine a more successful placement for these teenaged boys.

Ms. K changed her mind about KLG after defendant appeared early one morning at her house, drunk, demanding to see his sons.  For much of the time during this litigation, defendant was only permitted therapeutic supervised visitation with his sons.  After his comments about "going postal" to Maytidu, the licensed mental health clinician supervising his visits, her employer, Cooperative Counseling Services, refused to continue to supervise them without security, requiring they be moved to the Division's offices.  Although both Maytidu and Cusumano testified the visits often went well, the record is replete with reports of defendant's aggressive and threatening conduct toward the boys on multiple occasions during those <u>supervised</u> visits.  The trial judge

A-1314-18T3

acknowledged defendant was sometimes inappropriate, noting "[o]f course, he's a severely mentally ill person, who's not getting treatment."

There are certainly reasons that might militate against an unrelated, or indeed, any resource parent from entering into a KLG on this record. KLG, of course, "is not intended as an equally available alternative to termination," R.G. 217 N.J. at 558 (quoting S.V., 362 N.J. Super. at 88), and "when the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights." Id. at 558-59 (quoting N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 513 (2004)). As acknowledged by the trial judge, KLG was not appropriate here as an alternative to termination under the third prong as Ms. K wants to adopt Samuel and David. It was, therefore, an inappropriate consideration under the fourth prong in determining whether termination would do more harm than good. Obviously, applying pressure on a resource parent to effect a KLG, otherwise unavailable because the resource parent would prefer the permanency of adoption, would be wholly inappropriate under any circumstances.

Instead of erroneously considering an option statutorily unavailable, the trial judge should have focused on the resource parent's "willingness to permit continued visitation" between the boys and their father, which Dr. Dyer

deemed important to both, and critical to Samuel's wellbeing, as an integral part of its analysis under the fourth prong as expressly permitted by the Supreme Court in N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 288 (2007); see also In re Guardianship of J.N.H., 182 N.J. 29, 31 (2004).

We think it plain that the trial judge's analytical errors in assessing the second and fourth prongs, his erroneous ruling rejecting Dr. Dyer's testimony about the best interests of Samuel and David as a net opinion, thus avoiding the evidence in the record about the harm their father's untreated mental illness continues to pose to them and its probable consequences for the future, and the judge's mistaken belief that long term foster care was an appropriate alternative permanency plan for these boys compel vacating the decision dismissing the guardianship complaint.

We have considered a further direction to the trial court to enter a judgement terminating defendant's parental rights, as the Division and David's Law Guardian urge us to do. There is support for that in this record, which, as we have noted, is almost entirely undisputed. Neither defendant nor the Law Guardians put in any evidence. Further, there is no question but that the Division has proved by clear and convincing evidence the first three prongs of the best interests standard. The judge found the evidence "overwhelming" that

defendant's longstanding, severe mental health issues have, and will continue, to endanger the children's safety, health or development; that defendant has been unable to eliminate the harm facing the children, and will likely never be able to safely parent them; that the Division "made more than reasonable efforts to provide services to defendant" to help him correct the problems that led to the boys' placement and that there are no alternatives to termination. We agree.

That leaves only the fourth prong: whether termination would not do more harm than good. In our view, this would not have been a difficult call on this record. Considering that David's position for well over two years has been that he is desperate to have the Division out of their lives and wants to be adopted by Ms. K so he could have a "normal" life, coupled with Dr. Dyer's opinion that termination would "basically [be] a net gain for [David] in terms of stability," it is difficult to see how one could find that termination would do more harm than good as to David, especially as Ms. K has committed to David that she will assist him in maintaining his relationship with his father.

The issues as to Samuel are more complex. Samuel has sometimes expressed the desire to be adopted by Ms. K, the position he took at trial, and at other times to remain in her care but not be adopted by her, thus maintaining

his father's parental rights, the position he takes on appeal. The testimony of Maytidu and Cusumano reflect that Samuel is the more sensitive of the twins, and that his father appears to have higher expectations for his brother. Further, defendant often inappropriately directed his anger and frustration for upheavals and setbacks in his own life at Samuel. Both Maytidu and Dr. Dyer testified that Samuel has been made to feel responsible for his father, in a reversal of the usual roles.

Dr. Dyer opined that whether Samuel would suffer any harm from the termination of parental rights would depend on whether he was afforded contact with his father. Significantly, Dr. Dyer opined that if defendant's "parental rights were terminated and it was made clear to [Samuel] that he was going to be with his resource mother permanently, then that would enable him to move on" and "more fully accept what the resource mother has to offer in terms of nurturance, structure, stability, guidance, [and] positive role modeling. If, on the other hand," Samuel's contact with his father was ended, Dr. Dyer believed Samuel could likely "be preoccupied with this theme of having lost his entire family now, and that would exacerbate his behavior problems."

A-1314-18T3

Dr. Dyer stressed that both these adolescent boys had not only suffered the early loss of their mother, but also carry with them the experiences of the chaotic conditions of their childhood, including repeated disruptions in the continuity of their care. He offered that for them, "feeling like they fit in is a very important part of their healing process." Adoption by Ms. K offered them the best chance of moving past those experiences and not having them burden and dictate the rest of their lives. As the Supreme Court observed in E.P., "[w]hen a parent has exposed a child to continuing harm through abuse or neglect," and been "unable to remediate the danger," and the child has found a "nurturing and safe home" with resource parents committed to adoption, "in those circumstances termination of parental rights likely will not do more harm than good." 196 N.J. at 108. "The 'good' done to a child in such cases in which reunification is improbable is permanent placement with a loving family, which after all is the principal goal of our foster care system." Ibid.

These two sixteen-year-old boys have now been out of their father's care for half their lives. They have lived with their resource parent for over five years. Long-term foster care for children who had the promise of adoption by a resource parent who has provided them a loving home and could secure their future, because the court has decided the children do not need permanency,

71

contrary to State law and public policy, is unacceptable. Although we might debate the trial judge's opinion about how little difference there is between KLG and adoption, there can be no debate that the difference between long term foster care and adoption is vast. See N.J. Div. of Youth & Family Servs. v. D.P., 422 N.J. Super. 583, 593-94 (App. Div. 2011) (noting the standard contract between the Division and the resource parent acknowledges the aim of providing the child in placement a safe and stable home-life by accepting and nurturing adults, while recognizing the Division alone holds the responsibility "for making permanent plans for each child placed" and prohibits the resource parent from making "their own plans for the child's future").

Although we believe these boys are owed a prompt resolution of their situation, we reluctantly conclude we cannot bring this case to conclusion. It has been over eighteen months since the trial court's decision in this matter. Although we do not know the reasons for the delay, we think it too long to act ourselves in resolving the matter. The children's situation and their wishes and concerns about adoption could have changed from what it was at the time of trial.

Accordingly, we reinstate the Division's complaint for guardianship, conclude the Division has carried its burden of clear and convincing evidence

on the first three prongs of the statutory best interests standard and remand for a determination on the fourth prong as to whether termination of defendant's rights will do more harm than good, with findings made as to each child, see N.J. Div. of Child Prot. & Permanency v. C.J.R., 452 N.J. Super. 454, 474-75 (App. Div. 2017). The court may direct updated expert reports in its discretion. In considering whether termination will not do more harm than good, the court should consider any offer by the resource parent to permit continued contact between the boys and defendant. See M.M., 189 N.J. at 288 (considering the resource parents' "willingness to permit continued visitation" as "[i]ntegral to [the Court's] analysis under the fourth prong").

Because the judge who heard the matter has rendered an opinion on the credibility of the Division's expert, the hearing on remand should take place before a different judge. See A.W., 103 N.J. at 617. Accordingly, we direct the matter be specially assigned to a new judge for expeditious disposition, which shall occur within the next sixty days.

Vacated and remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1314-18T3